[Cite as *State v. Messenger*, 2010-Ohio-479.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## MARION COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,                  CASE NO. 9-09-19

    v.

RYAN MESSENGER,                     O P I N I O N

    DEFENDANT-APPELLANT.

Appeal from Marion County Common Pleas Court
Trial Court No. 08-CR-491

**Judgment Affirmed**

Date of Decision: February 16, 2010

APPEARANCES:

    *Kevin P. Collins* for Appellant

    *Brent W. Yager* for Appellee

**PRESTON, P.J.**

{¶1} Defendant-appellant, Ryan Messenger[1] (hereinafter "Messenger"), appeals the Marion County Court of Common Pleas' judgment of conviction and sentence. For the reasons that follow, we affirm.

{¶2} On November 26, 2008, Messenger was indicted on count one of weapons under a disability in violation of R.C. 2923.13(A)(2), a third degree felony, and count two of domestic violence in violation of R.C. 2919.25(A), a first degree misdemeanor. (Doc. No. 1). On December 1, 2008, Messenger was arraigned and entered pleas of not guilty to both counts. (Doc. No. 3).

{¶3} On December 23, 2008, the State filed a supplemental indictment charging Messenger with count three, a one-year firearm specification as to count one. (Doc. No. 11). On December 29, 2008, Messenger appeared pro se, was arraigned, and entered a plea of not guilty to count three of the amended indictment. (Doc. No. 13).

{¶4} On March 10, 2009, Messenger, pro se, filed a motion to suppress a four-page handwritten letter he had written to Keith Mabe, which was found at Mabe's residence, and an excerpt from Patrolman Isom's incident report. (Doc. No. 43).

---

[1] We note that Messenger represented himself throughout the proceedings below. Messenger filed a written waiver of counsel pursuant to Crim.R. 44(C) on January 16, 2009 for the trial court proceedings. (Doc. No. 21). Messenger is represented by counsel on appeal, and this Court also allowed Messenger to file a supplemental pro se brief.

{¶5} On March 19, 2009, the State filed a supplemental indictment charging Messenger with count three of theft in violation of R.C. 2913.02(A)(1), a third degree felony and count four of having weapons while under disability in violation of R.C. 2923.13(A)(2), a third degree felony. (Doc. No. 63).[2]

{¶6} On March 20, 2009, the court held a hearing on Messenger's motion to suppress evidence, and, on March 23, 2009, the trial court filed its entry denying the motion. (Doc. Nos. 51, 71). At the conclusion of the motion hearing, the State moved to dismiss count three of the supplemental indictment filed December 23, 2008, a one-year firearm specification as to count one, which motion was granted by the trial court. (Doc. No. 70).

{¶7} On April 2-3, 2009, the matter proceeded to a jury trial. The jury found Messenger guilty on count one of having weapons while under a disability and count two of domestic violence but not guilty on count three of theft. (Doc. Nos. 93-95).

{¶8} On April 8, 2009, the trial court sentenced Messenger to five (5) years imprisonment on count one and one hundred eighty (180) days on count two. (Apr. 8, 2009 Sentencing Hearing Tr. at 451); (Apr. 9, 2009 JE, Doc. No. 98).

---

[2] At a final motion hearing held April 1, 2009, the day before the trial, the State moved to dismiss count one of the originally filed indictment and replace it with count four of the supplemental indictment filed March 19, 2009. These counts were substantively the same, charging Messenger with having weapons while under disability; however, the supplemental indictment added the mental culpability standard of recklessness. (Apr. 1, 2009 Tr. at 80-81). Messenger agreed to this substitution. (See id.).

The trial court further ordered that these terms be served concurrently to each other. (Id.).

**{¶9}** On May 7, 2009, the trial court appointed appellate counsel, and Messenger filed his notice of appeal. (Doc. Nos. 101, 103). Messenger now appeals raising twelve assignments of error for our review. We elect to address some of Messenger's assignments of error out of the order they appear in his brief and to combine his assignments of error where appropriate.

### ASSIGNMENT OF ERROR NO. I

**THE TRIAL COURT ERRED TO THE PREJUDICE OF DEFENDANT-APPELLANT BY DENYING HIS MOTION TO SUPPRESS HIS LETTER TO KEITH MABE.**

**{¶10}** In his first assignment of error, Messenger argues that the trial court erred by denying his motion to suppress his letter to Keith Mabe. Specifically, Messenger asserts that he had capacity to challenge the search of Mabe's residence since he was an overnight guest. Alternatively, Messenger argues that Mabe never voluntarily consented to the search of his home. We disagree.

**{¶11}** A review of the denial of a motion to suppress involves mixed questions of law and fact. *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶8. At a suppression hearing, the trial court assumes the role of trier of fact and, as such, is in the best position to evaluate the evidence and the

credibility of witnesses. See *State v. Carter* (1995), 72 Ohio St.3d 545, 552, 651 N.E.2d 965.

{¶12} When reviewing a ruling on a motion to suppress, deference is given to the trial court's findings of fact so long as they are supported by competent, credible evidence. *Burnside* at ¶8. With respect to the trial court's conclusions of law, however, our standard of review is de novo and we must decide whether the facts satisfy the applicable legal standard. *State v. McNamara* (1997), 124 Ohio App.3d 706, 710, 707 N.E.2d 539.

{¶13} Whether a defendant has standing to challenge the constitutionality of the search of a home depends upon "whether the defendant had an expectation of privacy in the home that society is prepared to recognize as reasonable." *State v. Williams* (1995), 73 Ohio St.3d 153, 166, 652 N.E.2d 721, citing *Rakas v. Illinois* (1978), 439 U.S. 128, 131, 99 S.Ct. 421, 424, 58 L.Ed.2d 387, 393, fn. 1, and *State v. Steele* (1981), 2 Ohio App.3d 105, 107, 440 N.E.2d 1353. However, "[t]he burden is upon the defendant to prove facts sufficient to establish such an expectation." *Williams*, 73 Ohio St.3d at 166. An overnight guest may have a reasonable expectation of privacy in another's home, but whether that expectation is reasonable depends upon the totality of the circumstances. *Minnesota v. Olson* (1990), 495 U.S. 91, 96-97, 110 S.Ct. 1684, 109 L.Ed.2d 85; *State v. Coleman*

(1997), 118 Ohio App.3d 522, 525, 693 N.E.2d 825, citing *Williams*, 73 Ohio St.3d at 166.

**{¶14}** The evidence presented at the suppression hearing demonstrated that Messenger was Keith Mabe's childhood friend of seventeen (17) years. (Mar. 20, 2009 Tr. at 21). Mabe testified that he lived with his mother at 148 Kenmore Avenue (hereinafter the "residence" or "house"), but Messenger never "lived" at this residence. (Id. at 21-22). Mabe estimated that, at one point, Messenger was staying at the residence five to six (5-6) days per week, but the last time Messenger stayed there was the night before he was arrested, on November 24th or 25th of 2008. (Id. at 22, 24). Mabe testified that he consented to the search of the residence on January 25, 2009, and that the letter Messenger wrote to him (State's exhibit 1) was found during that search. (Id. at 23-24). Mabe further testified that Messenger had been at the residence twice within the past two (2) weeks prior to the suppression hearing, but Messenger did not stay overnight. (Id. at 24-25). Messenger did not have any specific room in the house nor did he have a dresser for his clothes, though Messenger may have left "a shirt or two there." (Id. at 25).

**{¶15}** On cross-examination, Mabe testified that, a year or two ago, Messenger was "pretty much living" at the residence. (Id. at 27). Mabe testified that he gave no restrictions on Messenger as a guest and that Messenger had

permission to use any of the household items. (Id. at 27-28). Messenger washed and dried his clothes and took showers at the residence. (Id. at 28). Mabe testified that on the day of the search, January 23, 2009, Messenger was in jail. (Id. at 30). Mabe further testified that, on the day of Messenger's arrest, Messenger was moving into the residence but was ultimately arrested and unable to move in. (Id. at 32). On redirect, Mabe testified that, at the time of Messenger's arrest, he was living with Jessica Mullins. (Id. at 42). Messenger had his clothes and belongings at the apartment he shared with Mullins. (Id.). Mabe testified that Messenger did not have his belongings in the residence, except for a shirt or some miscellaneous items that Messenger left there. (Id. at 42-43).

{¶16} Based upon the totality of the circumstances, we cannot conclude that the trial court erred in finding that Messenger failed to establish standing to challenge the constitutionality of the search of Mabe's residence. The facts of this case are analogous to those in *Williams*, supra. Like the defendant-appellant in *Williams*, the residence searched belongs to another person (Mabe's mother); Messenger *possibly* had some personal items (one or two shirts) in the residence; and Messenger was staying somewhere else at the time of the search (jail). 73 Ohio St.3d at 166. Although there was evidence that Messenger was staying at Mabe's residence almost daily a year or two ago, for several months prior to the search Messenger was in jail and not an overnight guest in the house. The fact

that Messenger was not an overnight guest at the time of the search is an important factor to consider. *Williams*, 73 Ohio St.3d at 166 ("* * * there was no evidence that appellant was an overnight guest in the apartment *at the time the police executed the search warrant*.") (emphasis added); *State v. Davis* (1992), 80 Ohio App.3d 277, 285, 609 N.E.2d 174 (distinguishing the facts therein from *Minnesota v. Olson*, supra, on the basis that the defendant was not an overnight guest the evening of the search, nor even a week prior to the search.).

{¶17} Aside from lacking a reasonable expectation of privacy in Mabe's residence, Messenger also lacked a reasonable expectation of privacy in the letter he sent through the U.S. postal service to Mabe. *State v. Haberek* (1988), 47 Ohio App.3d 35, 41-43, 546 N.E.2d 1361. "[A]n individual has no legitimate expectation of privacy when he reveals information to a third party on the assumption it will be used for only a limited purpose and the third party betrays such confidence and conveys the information to the government." Id., citing *Smith v. Maryland* (1979), 442 U.S. 735, 99 S.Ct. 2577, 61 L.Ed.2d 220, citing *U.S. v. Miller* (1976), 425 U.S. 435, 96 S.Ct. 1619, 48 L.Ed.2d 71. Furthermore, the letter at issue here was left on the kitchen counter outside its envelope in open sight available for anyone in the residence to read. Accordingly, Messenger did not have a "reasonable expectation of privacy" in the letter; and therefore, he lacked standing to challenge the search of the contents of the letter as well.

{¶18} Since we have determined that Messenger lacked standing, we need not consider his argument that Mabe's consent to the search was not voluntary.

{¶19} Messenger's first assignment of error is overruled.

**ASSIGNMENT OF ERROR NO. IX**

**DEFENDANT-APPELLANT'S CONVICTION FOR HAVING A WEAPON UNDER DISABILITY IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.**

{¶20} In his ninth assignment of error, Messenger argues that his conviction for having a weapon while under a disability was against the manifest weight of the evidence. Specifically, Messenger argues that the State failed to prove that he knowingly acquired, had, carried, or used a firearm since: his personal belongings were not found near the firearm; his fingerprints were not found on the firearm; and the only evidence connecting him with the gun was the testimony of the victim, which was not credible or trustworthy. We disagree.

{¶21} In determining whether a conviction is against the manifest weight of the evidence, a reviewing court must examine the entire record, "'[weigh] the evidence and all reasonable inferences, consider the credibility of witnesses and [determine] whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Thompkins* (1997), 78 Ohio St.3d 380, 387, 678 N.E.2d 541, quoting *State v. Martin* (1983), 20 Ohio

App.3d 172, 175, 485 N.E.2d 717. A reviewing court must, however, allow the trier of fact appropriate discretion on matters relating to the weight of the evidence and the credibility of the witnesses. *State v. DeHass* (1967), 10 Ohio St.2d 230, 231, 227 N.E.2d 212.

{¶22} Circumstantial evidence is given the same weight as direct evidence. *State v. Treesh* (2001), 90 Ohio St.3d 460, 485, 739 N.E.2d 749, citing *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492. In fact, "circumstantial evidence * * * may also be more certain, satisfying and persuasive than direct evidence." *State v. Lott* (1990), 51 Ohio St.3d 160, 167, 555 N.E.2d 293, citations omitted.

{¶23} R.C. 2923.13 provides, in pertinent part:

**(A) * * * no person shall knowingly acquire, have, carry, or use any firearm or dangerous ordnance, if any of the following apply: * * * (2) The person is under indictment for or has been convicted of any felony offense of violence[.]**

"In order to 'have' a firearm [within the meaning of R.C. 2923.13], one must either actually or constructively possess it." (Emphasis omitted.) *State v. Hardy* (1978), 60 Ohio App.2d 325, 327, 397 N.E.2d 773. A person has constructive possession of something when he is able to exercise dominion and control over that item. *State v. Wolery* (1976), 46 Ohio St.2d 316, 329, 348 N.E.2d 351.

{¶24} At the beginning of the trial, Messenger stipulated that: he had a prior felony offense of violence and is, therefore, under a disability and could not

acquire, have, carry, or use a firearm. (Apr. 2-3, 2009 Tr. at 205). Messenger further stipulated that he knew he was under disability and was reckless in that regard. (Id.). Therefore, the State was only required to show that Messenger acquired, had, carried, or used a firearm for purposes of a conviction.

{¶25} Jessica Mullins, Messenger's girlfriend, testified that Messenger brought a shotgun into the apartment they shared together about a week prior to the domestic violence incident because of a high number of break-ins in the area. (Id. at 261-62). Mullins was not sure where Messenger obtained the gun, but testified that Messenger knew he was not supposed to have it. (Id. at 262). Mullins identified State's exhibit one (1) as the shotgun that Messenger brought to the apartment. (Id. at 261); (State's Ex. 1). On the day of the domestic violence incident, Mullins called 9-1-1 and informed the operator about the gun. (Id. at 261); (State's Ex.28). Mullins testified that Messenger and her slept in the same bedroom where the shotgun was found. (Id. at 268-69).

{¶26} Officer Andrew Isom identified State's exhibit one (1) as the Remington 12 gauge Express Magnum shotgun he located on the master bedroom dresser in Mullins' apartment. (Id. at 213-14); (State's Ex. 3). Officer Isom testified that the shotgun was operable, and he found the shotgun with several rounds next to it and with the safety off. (Id. at 215); (State's Ex. 3). Officer Isom identified State's exhibit seventeen (17) as Mullins' written statement wherein she

indicated that Messenger brought the shotgun to the apartment about a week prior to the incident for protection from break-ins. (Id. at 226-27). Officer Isom also confirmed that Mullins' written statement was consistent with what she told him at the scene. (Id. at 226).

{¶27} Officer Baldridge testified that he sent a request for an ATF firearms trace on the shotgun and discovered it was purchased at a Dunham's Discount Sports store by Nicole Sils Ongalisbang. (Id. at 302-05). Ongalisbang testified that she purchased the shotgun as a Christmas gift in 1999 for her then boyfriend and father of her daughter, Keith Mabe. (Id. at 306-07). Messenger's childhood friend, Keith Mabe, confirmed that he received a 12 gauge Remington shotgun from Ongalisbang as a Christmas gift. (Id. at 311-12). Mabe testified that he thought State's exhibit one (1) was the same gun he received from Ongalisbang, which he noticed was missing from his house. (Id. at 312-14). Mabe testified that Messenger would have had access to the gun in his home, though many other people did as well. (Id. at 315). However, Mabe identified State's exhibit thirty-two (32) as a taped conversation between Messenger and him that occurred while Messenger was in jail. (Id. at 327); (State's Ex. 32). Mabe testified that, during a portion of the conversation where he was talking about getting various items from Mullins' apartment, he was referring to the shotgun as well. (Id. at 327). Mabe testified:

> **Q: The segment I just played for you, you state "I need to get all the shit and everything, yeah, on the other hand on that other shit dude, what am I gonna do?  I'm going to scratch that, and you're gonna have to make that right later."  First of all, this gun, is it the first gun you owned?**
> **A: I've owned other guns, but – yeah, it was one of my first guns.**
> **Q: Okay.  Mr. Messenger says "Yeah, you know what I mean. Yeah definitely.  You know, cause that was my first shit, you hear me, that I ever had." What are you talking about?**
> **A: I'm talking about the gun.**

(Id.).   Mabe also identified State's exhibit twenty-nine (29) as the original and State's exhibit thirty-three (33) as an accurate copy of a letter he received from Messenger. (Id. at 330-32).    Mabe read aloud certain pertinent portions of the letter, including:

> **Don't let anyone read this letter and be sure to destroy it if you – when you're done reading it.  Be sure to destroy the envelope also."  * * * "First never say anything about anything on the phone.  If they haven't already, they are going to ask her what – ask her where that came from.  I know she'll say you, without a doubt she'll say you gave it to me and you'll get charged and you'll go to the joint for some real time.  If they can't prove it you can probably save yourself if you just stay silent.  Or they find this letter or if they pull the phone records and listen to our conversations and read between the lines you could be in trouble.  If she does – if she hasn't already the first thing they'll do is try to get Jess to tell them where shit came from.  You already know where things will go from there.  The best way to * * * deter her is to be courteous but keep her at a distance like the snitch she is. * * * Flush it or mutilate it and throw it away. Don't let anyone see this.  You can't trust anyone out there.  You already know that.  This is more important than a few measly dollars.  Be careful on the phone.  Incryptic (sic) talk can be decrypted or deciphered by crafty law enforcement people. Alright bro, I'll call you soon.  I'll only say if you've got this or**

> **not. Do not talk about the case at all. Please, for both our good, destroy this letter. Later bro.**

(Id. at 332-34); (State's Exs. 29, 33).

**{¶28}** After reviewing this evidence, we cannot conclude that Messenger's conviction for having a weapon while under disability was against the manifest weight of the evidence. The jury had both direct and circumstantial evidence from which it could have concluded that Messenger had both actual and constructive possession of the shotgun. Mullins testified that Messenger brought the gun into the apartment. Mullins also testified that Messenger kept the gun in the bedroom where they both slept, upon which the jury could have concluded that Messenger had, at minimum, constructive possession of the shotgun. *State v. Wyatt*, 9th Dist. No. 22070, 2004-Ohio-6546, ¶¶23-26. Aside from Mullins' testimony, Mabe, Messenger's childhood friend, testified that he thought the gun found in Mullins' and Messenger's shared apartment was his gun. Furthermore, Mabe testified that Messenger called him from jail to talk about the gun, and the letter Messenger wrote Mabe contained references about something in Mullins' apartment that Messenger was not supposed to have. A reasonable juror could have inferred from this evidence that Messenger obtained the gun from Mabe.

**{¶29}** Messenger's ninth assignment of error is, therefore, overruled.

## ASSIGNMENT OF ERROR NO. XI

**DEFENDANT-APPELLANT'S CONVICTION FOR DOMESTIC VIOLENCE IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.**

## ASSIGNMENT OF ERROR NO. X

**THE RECORD CONTAINS INSUFFICIENT EVIDENCE TO SUPPORT DEFENDANT-APPELLANT'S CONVICTION FOR DOMESTIC VIOLENCE.**

{¶30} In his eleventh assignment of error, Messenger argues that his domestic violence conviction was against the manifest weight of the evidence. Specifically, Messenger argues that his domestic violence conviction was against the manifest weight of the evidence because the only testimony that he caused physical harm to Mullins was her testimony, which was not credible. In his tenth assignment of error, Messenger argues that his domestic violence conviction was not supported by sufficient evidence because the State failed to prove he was "a person living as a spouse" since it failed to present evidence of cohabitation. We disagree.

{¶31} As an initial matter, Messenger failed to move for a Crim.R. 29(A) motion for acquittal; and therefore, he has waived all but plain error with regard to the sufficiency of the evidence. (Apr. 2-3, 2009 Tr. at 361); *State v. Robinson*, 177 Ohio App.3d 560, 2008-Ohio-4160, 895 N.E.2d 262, ¶18, overruled on other grounds by *State v. Robinson*, 124 Ohio St. 3d 76, 2009-Ohio-5937, 919 N.E.2d

¶90. We recognize plain error "'with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.'" *State v. Landrum* (1990), 53 Ohio St.3d 107, 111, 559 N.E.2d 710, quoting *State v. Long* (1978) 53 Ohio St.2d 91, 372 N.E.2d 804, paragraph three of the syllabus. Under the plain error standard, the appellant must demonstrate that the outcome of his trial would clearly have been different but for the trial court's errors. *State v. Waddell* (1996), 75 Ohio St.3d 163, 166, 661 N.E.2d 1043, citing *State v. Moreland* (1990), 50 Ohio St.3d 58, 552 N.E.2d 894. The standard of review for manifest weight was provided above.

{¶32} R.C. 2919.25 provides, in pertinent part:

**(A) No person shall knowingly cause or attempt to cause physical harm to a family or household member.**
**\* \* \***
**(1)  "Family or household member" means any of the following:**
**(a)  Any of the following who is residing or has resided with the offender:**
**(i)  A spouse, a person living as a spouse, or a former spouse of the offender;**
**\* \* \***
**(F) As used in this section \* \* \***
**(2) "Person living as a spouse" means a person \* \* \* who otherwise is cohabiting with the offender, \* \* \***

{¶33} Jessica Mullins testified that Messenger was her boyfriend. (Apr. 2-3, 2009 Tr. at 255). Mullins further testified that, on November 24, 2008, Messenger and she had an argument about driving directions while they were driving home from Columbus. (Id. at 257-58). Mullins testified that she stayed at

her mother's house that night, and Messenger stayed at Mabe's house. (Id. at 258). The next day, November 25, 2008, Mullins called Messenger, and Messenger informed her that he wanted to get his belongings from her apartment. (Id.). Mullins picked Messenger up and the two began driving to her apartment when they began to rehash the prior day's argument and also argued about him moving out of the apartment. (Id. at 259). Mullins testified that, as she was driving, Messenger reached over from the passenger's side seat and grabbed her and bit her on her face. (Id., id. at 267). Mullins identified State's exhibits eight and nine (8 & 9) as photographs of the injuries Messenger caused when he bit her on the face. (Id. at 267); (State's Exs. 8-9). On cross-examination, Mullins insisted that Messenger left teeth marks on her face from biting her, and that Messenger did not merely put his mouth on her face. (Id. at 285). On redirect, Mullins testified that she informed the 9-1-1 operator that Messenger bit her as well. (Id. at 290). Mullin's 9-1-1 call was played at trial for the jury to hear. (Id. at 271); (State's Ex. 28). During the emergency phone call, Mullins states, "[m]y boyfriend just grabbed me by my face and bit me * * *." (State's Ex. 28). Mullins' voluntary statement also states, "he grabbed my face and bit me under my eye on the check [sic] * * *." (State's Ex. 17). State's exhibits four thru ten (4-10) were photographs of Mullins' face after the biting; these pictures show redness and

irritation to her left cheek and a red mark or gouge under her right eye. (State's Exs. 4-10).

**{¶34}** Aside from Mullins' testimony, Officer Isom testified that, when he reported to the scene of the incident, he observed:

> **\* \* \* visible injuries to her face \* \* \* the injuries that I saw were a red, puffy mark under her right eye that I could see white indentations, it's where it looked like someone had bit somebody in the face. And then I also saw marks on the –what would be her left side of her face where it would appear that someone grabbed her.**

(Apr. 2-3, 2009 Tr. at 209, 212). Isom identified State's exhibits four thru ten (4-10) as the photographs he took of Mullins' injuries. (Id. at 218-21). Michelle Hughes, Mullins' mother, testified that Mullins told her that Messenger bit her, and she saw red marks under both Mullins' chin and eye. (Id. at 366, 373-74). From this evidence, the jury could have reasonably concluded that Messenger "knowingly cause[d] or attempt[ed] to cause physical harm" to Mullin. R.C. 2919.25(A).

**{¶35}** With regard to whether Messenger was "a family or household member" under R.C. 2919.25(A), the State presented evidence that Messenger was "a person living as a spouse" as defined under R.C. 2919.25(F)(2), i.e. that Messenger was cohabiting with Mullins. The essential elements of "cohabitation" under R.C. 2919.25(F)(2) are: (1) sharing of familial or financial responsibilities;

and (2) consortium. *State v. Williams* (1997), 79 Ohio St.3d 459, 465, 683 N.E.2d 1126.

> **Possible factors establishing shared familial or financial responsibilities might include provisions for shelter, food, clothing, utilities, and/or commingled assets. Factors that might establish consortium include mutual respect, fidelity, affection, society, cooperation, solace, comfort, aid of each other, friendship, and conjugal relations. These factors are unique to each case and how much weight, if any, to give to each of these factors must be decided on a case-by-case basis by the trier of fact.**

Id.

{¶36} Mullins testified that Messenger was her live-in boyfriend and was sleeping with her in the same bedroom for three to four (3-4) months prior to the incident of domestic violence. (Id. at 255-57). From this testimony, the jury could have reasonably concluded consortium. *Williams*, 79 Ohio St.3d at 465. With regard to the sharing of financial responsibilities, Officer David Troutman identified several photographs he took at Mullins' apartment of mail addressed to "Ryan Messenger, 217 Libby Lane, Marion, Ohio 43302" (Mullins' apartment), including: State's exhibit fifteen (15) as an envelope from "Marion General Hospital"; and State's exhibit sixteen (16) as an envelope from "Great Lakes." (Apr. 2-3, 2009 Tr. at 294-95, 297-98). Officer Isom also identified these same exhibits, and identified State's exhibit twenty-five (25) as: "* * * a photograph of a piece of mail which – from looking at it was –like you had to send like a

monthly bill * * *," which was addressed to "Ryan Messenger and 217 Libby Lane." (Id. at 224-25, 253); (State's Ex. 25); (see, also, State's Ex. 26). State's exhibit fifteen (15), the envelope from Marion General Hospital, clearly states on the bottom "PLEASE DETACH AND RETURN TOP PORTION WITH YOUR PAYMENT." (State's Ex. 15). Mullins further testified that she still sometimes receives mail for Messenger at her address. (Id. at 268). From this evidence, a rational juror could conclude that Messenger was "sharing financial responsibility" with Mullins, especially in light of the fact that Messenger was residing with Mullins for four (4) months prior to the incident.

{¶37} Based upon all the evidence, we cannot conclude that Messenger's domestic violence conviction is against the manifest weight of the evidence. Contrary to his assertions, his conviction did not rest upon Mullins' testimony alone, but rather, the testimony of two independent witnesses who saw Mullins' injuries, as well as the photographic evidence. Furthermore, we are not persuaded that the State failed to show Messenger "cohabited" with Mullins for the purpose of showing he was a "person living as a spouse" under R.C. 2919.25(F)(2). Viewing all the evidence, a rational juror could find that Messenger was cohabiting with Mullins and was, therefore, a person living as a spouse under R.C. 2919.25(A). Furthermore, since we have found that Messenger's domestic violence conviction was not against the manifest weight of the evidence, we must

also conclude the State presented sufficient evidence to support the conviction. *State v. Ham*, 3d Dist. No. 16-09-01, 2009-Ohio-3822, ¶43; *State v. Sidders*, 3d Dist. No. 14-08-24, 2009-Ohio-49, ¶ 42, citations omitted. Nor do we find plain error with regard to Messenger's domestic violence conviction.

{¶38} Messenger's tenth and eleventh assignments of error are overruled.

## ASSIGNMENT OF ERROR NO. II

**THE TRIAL COURT ERRED TO THE PREJUDICE OF DEFENDANT-APPELLANT BY PROHIBITING HIM FROM SUBPOENAING DR. TRANEN.**

{¶39} In his second assignment of error, Messenger argues that he was denied his Sixth Amendment right to compulsory process to obtain witnesses in his favor when the trial court granted the State's motion in limine to exclude Dr. Tranen's testimony. We disagree.

{¶40} A motion in limine is a request, made in advance of the actual presentation of the evidence and usually prior to trial, that the court limits or excludes certain evidence which the movant believes is improper. *State v. Black*, 172 Ohio App.3d 716, 2007-Ohio-3133, 876 N.E.2d 1255, ¶11, citing *State v. Winston* (1991), 71 Ohio App.3d 154, 158, 593 N.E.2d 308. "The motion asks the court to exclude the evidence unless and until the court is first shown that the material is relevant and proper." *Black*, 2007-Ohio-3133, at ¶11. Since a trial court's decision on a motion in limine is a ruling to exclude or admit evidence, we

review the trial court's decision for an abuse of discretion that amounted to prejudicial error. Id., citing *State v. Yohey* (Mar. 18, 1996), 3d Dist. No. 9-95-46, citing *State v. Graham* (1979), 58 Ohio St.2d 350, 390 N.E.2d 805, and *State v. Lundy* (1987), 41 Ohio App.3d 163, 535 N.E.2d 664. An abuse of discretion constitutes more than an error of law or judgment; rather, it implies that the trial court acted unreasonably, arbitrarily, or unconscionably. *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 450 N.E.2d 1140.

{¶41} Messenger subpoenaed Dr. Tranen for the purpose of testifying that Mullins had been prescribed Suboxone, which Messenger described as "one of the most powerful narcotic [sic] on the prescription drug market today," and which Messenger believed affected Mullins' state of mind during the incident. (Apr. 1, 2009 Tr. at 85-86). The trial court then asked Messenger if he had any medical literature to support his claim that Suboxone could affect a person's state of mind, memories, or ability to recall. (Id. at 87). Messenger responded, "I'm not a doctor. That's why I wanted to get Miss Tranen on the stand and examine her in trial and ask her 'what do you think the effects of that drug on Miss Mullins is'". (Id. at 88). The following dialogue occurred thereafter:

> **THE COURT: So you're sort of guessing?**
> **MR. MESSENGER: No. I mean, I know her. I mean, I don't have any evidence here. I mean, I've been around her, I've lived with her for a while. She was my girlfriend. I saw her take a Seboxin (sic) on a daily basis. I've looked it up on the Internet and researched that. It's a very, very powerful narcotic.**

**THE COURT:** Does it give you any indication that it affects a person's recall perception?

**MR. MESSENGER:** Other than the fact that all narcotics would affect somebody's memory and working of the mind.

**THE COURT:** Let's put it this way. I'm inclined to sustain the Motion in Limine at this point. But if you get some medical literature indicating otherwise, I might reconsider the matter. That's the best I can do. I just can't go on your personal beliefs and such as far as that goes.

**MR. MESSENGER:** I'm not really asking you to go on my personal beliefs, I'm just asking can we get the doctor into trial and let the truth come out?

**THE COURT:** Not on your hunch. There's a lot of disruption you're doing there. You call a doctor out from her medical practice for – that's a pretty severe disruption of things.

**MR. MESSENGER:** Well, I mean, with all due respect to that, I mean, I'm on trial here for some very serious felonies.

**THE COURT:** And I agree.

**MR. MESSENGER:** Maximum penalty's of upwards of 10 years in prison. Sorry to inconvenience everybody, but I'm kind of inconvenienced myself.

* * *

**THE COURT:** Maybe, but you'd better be convenient enough to get some medical literature to support your opinions if you're wanting that doctor up here.

**MR. MESSENGER:** Okay. Then that's what I'll have to do, Your Honor.

**THE COURT:** Very good.

**MR. YAGER:** The only thing on that, I have no power over that subpoena, Your Honor. I'd ask at least it be sent back or the doctor can no – even if he's allowed to bring in the doctor it won't be till Friday, and she's scheduled to be here tomorrow at 9.

**THE COURT:** Alright.

**MR. YAGER:** I don't know what we can do about that.

**THE COURT:** Mr. Messenger, you were the one – you wouldn't be calling your case until they're done presenting their side of the case. They probably wouldn't –might be done by tomorrow, but you wouldn't be going to the defense case by –

**\* \* Let's do it that way. We'll take a look and see what the story is. Yeah, we'll set the subpoena back to Friday, I guess, as far as that goes. Somebody gonna inform the doctor about that? \* \* \***

**MR. YAGER: We'll give her a call and just tell her she'll still possibly need to be here Friday morning.**

**THE COURT: Alright. We'll go ahead and handle it that way.**

(Id. at 88-90).

**{¶42}** Based upon our review of the foregoing, we cannot conclude that the trial court abused its discretion by sustaining the State's motion in limine with respect to Dr. Tranen. To begin with, the trial court allowed Messenger an opportunity to present medical literature supporting his claims, but Messenger failed to do so. Messenger's only reason for calling Dr. Tranen was based upon his assumption that Suboxone affected Mullins' state of mind. Aside from that, we do not find the trial court's ruling prejudiced Messenger when he was allowed to ask Mullins directly about whether her medication impaired her thinking, to which she answered "No." (Apr. 2-3, 2009 Tr. at 281).

**{¶43}** Messenger's second assignment of error is, therefore, overruled.

## ASSIGNMENT OF ERROR NO. III

**THE TRIAL COURT ERRED TO THE PREJUDICE OF DEFENDANT-APPELLANT BY ALLOWING JESSICA MULLINS TO TESTIFY TO HEARSAY EVIDENCE OF OTHER ACTS.**

## ASSIGNMENT OF ERROR NO. IV

**THE TRIAL COURT ERRED TO THE PREJUDICE OF DEFENDANT-APPELLANT BY LIMITING HIS CROSS EXAMINATION OF MS. MULLINS REGARDING PRIOR ALLEGATIONS OF DOMESTIC VIOLENCE.**

**ASSIGNMENT OF ERROR NO. V**

**THE TRIAL COURT ERRED TO THE PREJUDICE OF DEFENDANT-APPELLANT BY LIMITING HIS EXAMINATION OF MICHELLE HUGHES.**

**ASSIGNMENT OF ERROR NO. VI**

**THE TRIAL COURT ERRED TO THE PREJUDICE OF DEFENDANT-APPELLANT BY LIMITING HIS EXAMINATION OF MR. MABE REGARDING JESSICA MULLINS [SIC] CHARACTER FOR UNTRUTHFULNESS.**

**{¶44}** In Messenger's third, fourth, fifth, and sixth assignments of error, he alleges the trial court erred with regard to evidentiary matters. Generally, these assignments of error relate to Messenger's attempts to discredit Mullins' credibility. Messenger's assignments of error lack merit.

**{¶45}** To begin with, "[i]t is well settled * * * that decisions concerning evidentiary matters, including the scope of cross-examination, are within the broad discretion of the trial court and are not subject to reversal on appeal in the absence of an abuse of that discretion." *State v. Williams* (June 6, 2000), 3d Dist. No. 1-99-86, at *7, citing *In re Estate of Bednarczuk* (1992), 80 Ohio App.3d 548, 554, 609 N.E.2d 1310; *O'Brien v. Angley* (1980), 63 Ohio St.2d 159, 163, 407 N.E.2d 490. An abuse of discretion constitutes more than an error of law or judgment; rather, it

implies that the trial court acted unreasonably, arbitrarily, or unconscionably. *Blakemore*, 5 Ohio St.3d at 219.

**{¶46}** "Additionally, any error in the admission or exclusion of evidence will be considered harmless error unless it affects a substantial right of the accused." *State v. Wegmann*, 3d Dist. No. 1-06-98, 2008-Ohio-622, ¶41, citing *State v. Condon* (2003), 152 Ohio App.3d 629, 2003-Ohio-2335, 789 N.E.2d 696, ¶80; Crim.R. 52(A); Evid.R. 103(A).  Errors not affecting a defendant's substantial rights must be disregarded. *State v. Schofield*, 4th Dist. Nos. 01CA36, 02CA13, 2002-Ohio-6945, ¶138, citing Crim.R. 52(A).  In other words, an appellate court will not reverse judgments for an erroneous evidentiary ruling unless it appears that the defendant's rights have been prejudiced. Id., citing *State v. Woolum* (Mar. 5, 1996), 4th Dist. No. 95CA2083.

**{¶47}** Messenger argues, in his third assignment of error, that the trial court erred when it allowed Mullins to testify regarding hearsay evidence of other acts which was highly prejudicial under Evid.R. 404.  Messenger points to the following testimony in support of this alleged error:

> **Q: Did he threaten to kill you?**
> **A: Yes.**
> **Q: Were you scared?**
> **A: Yes.**
> **Q: Why were you scared?**
> **A: Just from past things that I've heard that he's done and he's told me he's done.**
> **MR. MESSENGER: Objection.**

> **THE COURT: Overruled.**
> **Q: What past things did he tell you he had done?**
> **A: Just getting into fights with other girlfriends, and I've heard about, and other stuff he's done with shootings.**
> **MR. MESSENGER: Objection, Your Honor.**
> **THE COURT: Sustained.**

(Apr. 2-3, 2009 Tr. at 260). Messenger argues that sustaining the objection after Mullins testified was "too late; the damage was done." (Appellant's Brief at 15).

{¶48} Evid. R. 404(A) provides: "[a]lthough relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). Evid.R. 802 provides the general rule that hearsay is not permitted, but Evid.R. 803(3) provides an exception to the general rule for the declarant's then existing state of mind. Mullins' answer to the question "[w]hy were you scared?" goes to Mullins' state of mind and falls within Evid.R. 803(3)'s exception. Furthermore, Mullins' testimony was not offered for the truth of the matter asserted since the truthfulness of Mullins' testimony is irrelevant as to whether or not she was scared; and therefore, Mullins' testimony was not hearsay. Likewise, the first part of Mullins' testimony—"[j]ust getting into fights with other girlfriends"—to the prosecution's next question is not hearsay since it was a statement against interest under Evid.R. 801(D)(2). Finally, with regard to

Mullins' testimony that "I've heard about, and other stuff he's done with shootings," the trial court sustained Messenger's *general* objection. That Messenger waited to object until after Mullins testified is not error on the trial court's part but on Messenger's part for waiting to lodge the objection. For these reasons, we find that Messenger's third assignment of error lacks merit.

{¶49} In his fourth assignment of error, Messenger argues that the trial court erred by limiting his cross-examination of Mullins regarding her past allegations of domestic violence. Messenger's cross-examination of Mullins at trial was as follows:

> **Q: Isn't it true that you were, in the year of 2006, around February 22nd, you were involved an [sic] incident of Domestic Violence whereby you had accused your mother of assaulting you, but in fact, when the police showed up you were actually the one arrested on Domestic Violence?**
> **MR. YAGER: Objection.**
> **THE COURT: Sustained.**
> **MR. YAGER: I'm gonna ask that be stricken, Your Honor.**
> **THE COURT: It is ordered stricken. The jury will disregard the question.**

(Apr. 2-3, 2009 Tr. at 286). Messenger argues that there was no basis for sustaining the prosecution's objection, and that the question was related to the victim's truthfulness.

{¶50} Evid. R. 404(A)(3) provides, "[e]vidence of the character of a witness on the issue of credibility is admissible as provided in Rules 607, 608, and 609." Evid.R. 608(B) provides, in pertinent part:

**Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness's character for truthfulness, other than conviction of crime as provided in Evid. R. 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if clearly probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness's character for truthfulness or untruthfulness * * *.**

{¶51} A defendant is permitted, in the court's discretion, to cross-examine a victim about prior false accusations if they are clearly probative of truthfulness or untruthfulness pursuant to Evid.R. 608(B). *State v. Husseln*, 152 Ohio App.3d 67, 2003-Ohio-1369, 786 N.E.2d 536, ¶8, citing *State v. Boggs* (1992), 63 Ohio St.3d 418, 588 N.E.2d 813; *State v. Fredrick* (Mar. 8, 2002), 2nd Dist. No. 18996, at *3.

{¶52} After reviewing the record, we cannot find that the trial court abused its discretion by not allowing the testimony. As an initial matter, we must note that the prosecution's objection was a *general* objection; and therefore, the trial court's reason(s) for not allowing the testimony are not provided in the record. (Apr. 2-3, 2009 Tr. at 286). Accordingly, the trial court may have excluded the evidence, even though it was relevant, because Messenger's question was compound and confusing to the jury. Evid.R. 403(A). Although some appellate courts have found an abuse of discretion when a trial court refused to admit testimony of prior false accusations under Evid.R. 608(B), those cases involved multiple false allegations against the defendant. *Husseln*, 2003-Ohio-1369, at ¶8

(evidence that the victim had previously filed five false domestic-violence charges against the defendant that had resulted in either dismissals or acquittals); *Fredrick*, 2nd Dist. No. 18996, at *3 (evidence that the victim had previously filed multiple domestic-violence charges against the defendant that were either dismissed or law enforcement failed to file charges because they discovered there was no domestic violence). Unlike the defendants in *Husseln* and *Fredrick*, supra, Messenger attempted to offer evidence that Mullins fabricated *one* domestic violence charge *against her mother* more than two (2) years prior to incident herein. Aside from that, the trial court allowed Messenger to question Mullins about her 2004 conviction for check fraud to which Mullins admitted pleading guilty. (Apr. 2-3, 2009 Tr. at 383). Thus, Messenger was able to raise doubts about Mullins' credibility through this testimony. Under these circumstances we cannot find an abuse of discretion. Even if the trial court erred—which we do not find—its error is not reversible error since Messenger's convictions were based on more than Mullins' testimony alone. For all these reasons, we find that Messenger's fourth assignment of error lacks merit.

{¶53} In his fifth assignment of error, Messenger argues that the trial court erred by limiting his examination of Michelle Hughes. Specifically, Messenger objects to the trial court's rulings with respect to the following line of questioning:

> **Q: Do you remember telling me in that phone conversation that Jessica's the type of girl to put marks on her own face and call the Police and say you did it?**
> **MR. YAGER: Objection. That's a leading question.**
> **THE COURT: Sustained.**
> **MR. MESSENGER: Your Honor, leading questions are –**
> **THE COURT: Are not permitted in this situation.**
> **\* \* \***
> **Q: \* \* \* Do you remember warning me in any way about Jessica?**
> **MR. YAGER: I'm going to object again, Your Honor. Well, warning him in any way, I don't know if that's – he's looking for some specific incidents.**
> **MR. MESSENGER: You know, I'll move to strike that question and withdraw it.**
> **THE COURT: Okay.**
> **\* \* \***
> **Q: Did I express concern that Jessica may do something bad to me?**
> **MR. YAGER: Objection. That's hearsay, Your Honor. It's his statement out of court.**
> **THE COURT: Sustained.**
> **MR. MESSENGER: Yes, Your Honor.**
> **Q: In your opinion does Jessica Mullins have a tendency towards dishonesty?**
> **MR. YAGER: Objection.**
> **THE COURT: Sustained.**

(Apr. 2-3, 2009 Tr. at 369-70).

**{¶54}** Messenger argues that the first question was not leading, and was relevant since it related to Mullins' credibility. We disagree. "A leading question has been defined as a question that suggests a particular answer by the form or substance of the inquiry." *Haley v. Mason & Dixon Lines, Inc.* (Aug. 26, 1992), 1st Dist. No. C-910221, at \*5, citing *State v. Bradley* (Sept. 22, 1987), 4th Dist.

No. 1583. "To determine what constitutes a leading question, '[t]he whole issue is whether an ordinary man would get the impression that the questioner desired one answer rather than another.'" *Haley*, 1st Dist. No. C-910221, at *5, quoting McCormick, Evidence (4 Ed.1992), 17-18, Section 6. Messenger's question was phrased such that an ordinary man would get the impression his desired answer was "yes," and as such, it is leading. Messenger was not permitted to ask leading questions without the trial court's permission since he was conducting a direct examination of Hughes. Evid.R. 611(C). No such permission was asked or granted. We, therefore, find no error with regard to the trial court's ruling on this objection.

{¶55} We are also not persuaded that the trial court erred in its subsequent evidentiary rulings either. Messenger's question "[d]id I express concern that Jessica might do something bad to me?" elicited inadmissible hearsay testimony. Messenger now argues that it was relevant to show his state of mind, and therefore, admissible as an exception to the hearsay rule. This argument is lacking. Messenger never argued this at trial, and furthermore, Messenger's state of mind is irrelevant in this context. Next, Messenger argues that his question about Mullins "tendency towards dishonesty" was relevant to show Hughes' opinion about Mullins' truthfulness. We disagree. As an initial matter, we note that the trial court sustained a *general* objection to Messenger's question; and

therefore, the record does not indicate the trial court's basis for sustaining the objection. (Apr. 2-3, 2009 Tr. at 370). Additionally, Messenger's question did not ask Hughes her opinion of Mullins' "truthfulness or untruthfulness" as required by Evid.R. 608(A)(1); rather, Messenger asked about Mullins' "tendency towards dishonesty." (Id.). Evid.R. 608(A) provides, in pertinent part, "[t]he credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation, but subject to these limitations: (1) *the evidence may refer only to character for truthfulness or untruthfulness*[.]" Although the concepts of dishonesty and untruthfulness can overlap, they are not the same for purposes of Evid.R. 608(A). Furthermore, as we have already mentioned, Messenger was permitted to raise issues about Mullins' credibility by asking Mullins about her 2004 check fraud conviction. (Apr. 2-3, 2009 Tr. at 383). Additionally, as we have also noted, Messenger's convictions were not based upon Mullins' testimony alone. Under these circumstances, we cannot conclude that the trial court abused its discretion. Even if we were to conclude the trial court erred in this regard, we would not find its error constituted reversible error. Messenger's fifth assignment of error lacks merit.

{¶56} In his sixth assignment of error, Messenger argues that the trial court erred by limiting his examination of Keith Mabe as to his opinion of Mullins' "tendency towards dishonesty" and to Mullins' reputation for being "dishonest."

(Apr. 2-3, 2009 Tr. at 343-44). With regard to Messenger's question about Mabe's opinion, we find that Messenger's arguments lack merit for the same reasons given for the similar questions he asked of Hughes. With regard to the question of Mullins' reputation, Messenger failed to lay a sufficient foundation for this question in addition to incorrectly asking about Mullins' "dishonesty." That Mabe was friends with Mullins is an insufficient foundation for Mabe to testify about Mullins' reputation for truthfulness or untruthfulness in the community. (Id. at 339). For these reasons, Messenger's sixth assignment of error lacks merit.

{¶57} For all the aforegoing reasons, Messenger's third, fourth, fifth, and sixth assignments of error are all overruled.

### ASSIGNMENT OF ERROR NO. VII

**PROSECUTORIAL MISCONDUCT RENDERED DEFENDANT-APPELLANT'S TRIAL FUNDAMENTALLY UNFAIR IN VIOLATION OF THE CONSTITUTIONS OF OHIO AND THE UNITED STATES.**

{¶58} In his seventh assignment of error, Messenger argues that he was deprived a fair trial because of prosecutorial misconduct when the prosecutor requested to take a recess "so we can admonish the witness" in the presence of the jury. We disagree.

{¶59} "The test for prosecutorial misconduct is whether remarks were improper and, if so, whether they prejudicially affected substantial rights of the accused. The touchstone of analysis is the fairness of the trial, not the culpability

of the prosecutor." *State v. Jones* (2000), 90 Ohio St.3d 403, 420, 739 N.E.2d 300.

An appellate court should consider several factors in making this determination:

"(1) the nature of the remarks, (2) whether an objection was made by counsel, (3)

whether corrective instructions were given by the court, and (4) the strength of the

evidence against the defendant." *State v. Braxton* (1995), 102 Ohio App.3d 28, 41,

656 N.E.2d 970. The reviewing court should also ask whether the misconduct was

an isolated incident in an otherwise properly tried case. Id. A prosecutor's

misconduct will not be considered grounds for reversal unless the misconduct has

deprived the defendant of a fair trial. Id.

{¶60} After playing a copy of the recorded conversation between

Messenger and Mabe (State's Ex. 32), the prosecutor asked Mabe:

> **Q: What were you talking about there?**
> **A: Well, I was talking about tools that come up missing, and I also – I'm talking about things, that you know, I got a case pending and I might incriminate myself. Other things. Not that weapon.**
> **Q: We spoke last night?**
> **A: Yes, we did.**
> **Q: Did you not tell me last night that you were talking about the gun?**
> **A: I did not tell you that.**
> **MR. YARGER: Your Honor, I'd like to take a recess so we can admonish the witness.**
> **THE COURT: Alright. Ladies and gentlemen, we will take a short recess here. * * * It remains your duty not to form or express any opinion on this case until the case is finally submitted to you.**

(Apr. 2-3, 2009 Tr. at 319). After Mabe was admonished about the possible penalties for perjury, the trial court realized that it was 4:40 p.m. and that the matter would need to be continued until the next morning. (Id. at 324). The next day, Mabe was asked again about the recording and testified that he was talking about the gun. (Id. at 327).

{¶61} After reviewing the transcript, we cannot conclude that the prosecutor's remarks in the presence of the jury deprived Messenger of a fair trial. Although the prosecutor probably should have asked this question at the bench in a sidebar conference, Messenger lodged no objection at trial; the trial court reminded the jury of its duty not to form opinions until after the case was finally submitted; and the evidence against the defendant was sufficiently strong that we cannot find reversible error on this basis. *Braxton*, 102 Ohio App.3d at 41. Additionally, we note that the prosecutor's comment might have actually *helped* Messenger since it raised a question of Mabe's credibility, and Mabe was a witness for the prosecution. We also believe this remark was an isolated oversight in an otherwise properly prosecuted trial. *Braxton*, 102 Ohio App.3d at 41. At most, we would find this amounted to harmless error.

{¶62} Messenger's seventh assignment of error is, therefore, overruled.

### ASSIGNMENT OF ERROR NO. VIII

**THE COMBINATION OF THE AFOREMENTIONED ERRORS ARE SUFFICIENT TO CALL INTO QUESTION**

**THE VALIDITY OF THE VERDICT, PREVENTING THE APPELLANT FROM OBTAINING THE FAIR TRIAL GUARANTEED BY THE FIFTH AND SIXTH AMENDMENTS TO THE U.S. CONSTITUTION AS MADE APPLICABLE TO THE STATES BY THE FOURTEENTH AMENDMENT, AND ARTICLE ONE, SECTIONS TEN AND SIXTEEN OF THE OHIO CONSTITUTION.**

**{¶63}** Messenger, in his eighth assignment of error, argues that the combination of the aforementioned errors prevented him from having a fair trial. We disagree.

**{¶64}** "[A] conviction will be reversed where the cumulative effect of errors in a trial deprives a defendant of the constitutional right to a fair trial even though each of numerous instances of trial court error does not individually constitute cause for reversal." *State v. Garner* (1995), 74 Ohio St.3d 49, 64, 656 N.E.2d 623. "The failure to establish multiple instances of harmless error makes the doctrine of cumulative error inapplicable." *State v. Hupp*, 3d Dist. No. 1-08-21, 2009-Ohio-1912, ¶33, citing *State v. Hohvart*, 7th Dist. No. 06 MA 43, 2007-Ohio-5349, ¶37. Messenger has failed to demonstrate multiple instances of harmless error. *Hupp*, 2009-Ohio-1912, at ¶33, citing *Hohvart*, 2007-Ohio-5349, at ¶37. Neither can we conclude that Messenger was denied his right to a fair trial. *Garner*, 74 Ohio St.3d at 64.

**{¶65}** Messenger's eighth assignment of error is overruled.

## ASSIGNMENT OF ERROR NO. XII

## DEFENDANT-APPELLANT'S SENTENCE FOR HAVING A WEAPON UNDER DISABILITY IS EXCESSIVE.

{¶66} In his twelfth assignment of error, Messenger argues that the trial court's imposition of five (5) years imprisonment for his having a weapon under disability conviction is excessive since it is "not commensurate with [his] conduct and is contrary to law because this is in no way the worst form of the offense." (Appellant's Brief at 25).

{¶67} A trial court's sentence will not be disturbed on appeal absent a defendant's showing by clear and convincing evidence that the sentence is unsupported by the record; the sentencing statutes' procedure was not followed or there was not a sufficient basis for the imposition of a prison term; or that the sentence is contrary to law.[3] *State v. Ramos*, 3d Dist. No. 4-06-24, 2007-Ohio-767, ¶23 (the clear and convincing evidence standard of review set forth under R.C. 2953.08(G)(2) remains viable with respect to those cases appealed under the applicable provisions of R.C. 2953.08(A), (B), and (C) * * *); *State v. Rhodes*, 12th Dist. No. CA2005-10-426, 2006-Ohio-2401, ¶4; *State v. Tyson*, 3d Dist. Nos. 1-04-38; 1-04-39, 2005-Ohio-1082, ¶19, citing R.C. 2953.08(G). Clear and

---

[3] We note that the Supreme Court of Ohio recently released a plurality opinion in *State v. Kalish*, 120 Ohio St.3d 23, 896 N.E.2d 124, 2008-Ohio-4912, which established a two-part test utilizing both the clear and convincing and abuse of discretion standard of review in reviewing felony sentencing decisions under R.C. 2953.08(G). While we cite to this Court's precedential clear and convincing standard of review, which was affirmed and adopted by three dissenting Justices in *Kalish*, we note that the outcome of our decision in this case would be identical under the *Kalish* plurality's two-part test as well.

convincing evidence is that "which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford* (1954), 161 Ohio St. 469, 120 N.E.2d 118, paragraph three of the syllabus; *State v. Boshko* (2000), 139 Ohio App.3d 827, 835, 745 N.E.2d 1111. An appellate court should not, however, substitute its judgment for that of the trial court because the trial court is "'clearly in the better position to judge the defendant's likelihood of recidivism and to ascertain the effect of the crimes on the victims.'" *State v. Watkins*, 3d Dist. No. 2-04-08, 2004-Ohio-4809, ¶16, quoting *State v. Jones* (2001), 93 Ohio St.3d 391, 400, 754 N.E.2d 1252.

{¶68} Messenger has failed to clearly and convincingly establish that his sentence was contrary to law. Messenger was convicted of one (1) count of having a weapon while under a disability in violation of R.C. 2923.13(A)(2), a third degree felony. R.C. 2929.14(A)(3) provides, "[f]or a felony of the third degree, the prison term shall be one, two, three, four, or five years"; and therefore, the trial court's imposition of five (5) years, being within the statutory range, is not contrary to law. Additionally, prior to imposing its sentence, the trial court stated that it considered the revised code sentencing factors and the specific circumstances of the case. (Apr. 8, 2009 Sentencing Hearing Tr. at 451). In its judgment entry, the trial court stated that it considered "the record, oral statements, any victim impact statement and pre-sentence report prepared, as well as the

principles and purposes of sentencing under R.C. 2929.11, and the appropriate factors under R.C. 2929.12." (Apr. 9, 2009 JE, Doc. No. 98). Messenger's pre-sentence investigation report (PSI)[4] indicates that Messenger previously pled guilty to one (1) count of felonious assault in violation of R.C. 2903.11(A)(2), a second degree felony with a three-year firearm specification. This offense was committed when Messenger was eighteen (18). Messenger also had an extensive juvenile record, including convictions for: grand theft, receiving stolen property, aggravated burglary, disorderly conduct, menacing, and felonious assault. (PSI). The State informed the trial court that Messenger had other infractions, including driving under suspension. (Apr. 8, 2009 Sentencing Hearing Tr. at 449). Aside from that, the State pointed out that Messenger was not a good candidate for community control since he had several community control violations and was previously terminated from judicial release. (Id. at 449-50). In light of the foregoing, we cannot find error in the trial court's imposition of five (5) years for Messenger's third degree felony conviction.

{¶69} Messenger's twelfth assignment of error is, therefore, overruled.

{¶70} Having found no error prejudicial to the appellant herein in the

---

[4] No PSI was prepared for this offense, but Messenger's Jan. 29, 1998 PSI was on file and considered by the trial court for purposes of sentencing Messenger. (See Apr. 9, 2009 JE, Doc. No. 98).

particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**ROGERS, J., concurs in Judgment Only.**
**/jlr**


**WILLAMOWSKI, P.J., Concurring Separately.**

{¶71} I concur fully with the majority opinion, however write separately to emphasize that the appropriate standard of review was applied. In his twelfth assignment of error, Messenger alleges that the trial court erred in imposing an excessive sentence because his conduct was not the worst form of the offense. Messenger's appeal of his felony sentence was not pursuant to R.C. 2929.12, which, in my opinion would require an abuse of discretion standard. Thus, the clearly and convincingly contrary to law standard used to review this case, as set forth in R.C. 2953.08(G), is the proper standard of review herein.

**/jlr**