[Cite as *State v. Taylor*, 2011-Ohio-1866.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## MARION COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,                        CASE NO.  9-10-44

    v.

TERRY L. TAYLOR,                      O P I N I O N

    DEFENDANT-APPELLANT.

Appeal from Marion County Common Pleas Court
Trial Court No. 09-CR-523

**Judgment Affirmed**

Date of Decision:  April 18, 2011

APPEARANCES:

    *Kevin P. Collins*  for Appellant

    *Denise M. Martin*  for Appellee

**PRESTON, J.**

{¶1} Defendant-appellant, Terry L. Taylor (hereinafter "Taylor"), appeals the Marion County Court of Common Pleas' judgment of conviction and sentence. For the reasons stated herein, we affirm.

{¶2} On October 29, 2009, the Marion County Grand Jury indicted Taylor on eight counts, including: count one of aggravated murder in violation of R.C. 2903.01(A), an unclassified felony; count two of aggravated murder in violation of R.C. 2903.01(B), an unclassified felony; count three of attempted aggravated murder in violation of R.C. 2903.01(A), R.C. 2923.02(A), a first degree felony; count four of attempted aggravated murder in violation of R.C. 2903.01(B), R.C. 2923.02(A), a first degree felony; count five of aggravated burglary in violation of R.C. 2911.11(A)(1), a first degree felony; count six of aggravated burglary in violation of R.C. 2911.11(A)(2), a first degree felony; count seven of felonious assault in violation of R.C. 2903.11(A)(2), a second degree felony; and count eight of having weapons while under disability in violation of R.C. 2923.13(A)(2), a third degree felony. Counts one through eight each had a three-year firearm specification included pursuant to R.C. 2941.145, 2929.14(D). (Doc. No. 1).

{¶3} On November 2, 2009, Taylor appeared for arraignment and entered pleas of not guilty to each count of the indictment. (Doc. No. 5).

{¶4} On April 7, 2010, the State moved to dismiss count eight of the indictment without prejudice, which the trial court granted on April 9, 2010. (Doc. Nos. 162, 174).

{¶5} A jury trial was held from May 10-14 & 17, 2010. The jury returned verdicts of GUILTY on counts one and two of aggravated murder, counts five and six of aggravated burglary, and count seven of felonious assault, and NOT GUILTY on counts three and four of attempted aggravated murder. (Doc. Nos. 248-54).

{¶6} A sentencing hearing was held on June 2, 2010. The trial court accepted the jury's verdicts, found Taylor guilty on counts one, two, five, six, and seven. (June 3, 2010 JE, Doc. No. 258); (Tr. at 1460-61). The trial court sentenced Taylor as follows: life without parole on count one and three years on the attached firearm specification; count two was merged with count one; ten years on count five; count six was merged with count five; and eight years on count seven. (Id.); (Id.). The trial court further ordered that the term imposed in count five be served consecutively to the terms imposed in counts one and seven, and the term imposed in count seven be served consecutively to the terms imposed in counts one and five, for a total sentence of life imprisonment without parole, plus twenty-one years. (Id.); (Id.). The trial court also ordered that Taylor serve the term imposed for the firearm specification prior to all other terms. (Id.); (Id.).

{¶7} On June 30, 2010, Taylor filed a notice of appeal. (Doc. No. 263). Taylor now appeals raising ten assignments of error for our review. We elect to combine several of Taylor's assignments of error for discussion where appropriate.

### ASSIGNMENT OF ERROR NO. I

**DEFENDANT-APPELLANT'S CONVICTION FOR AGGRAVATED MURDER IS CONTRARY TO THE MANIFEST WEIGHT OF [THE] EVIDENCE.**

### ASSIGNMENT OF ERROR NO. II

**DEFENDANT-APPELLANT'S CONVICTION FOR AGGRAVATED BURGLARY IS CONTRARY TO THE MANIFEST WEIGHT OF [THE] EVIDENCE.**

{¶8} In his first assignment of error, Taylor argues that his aggravated murder convictions are contrary to the manifest weight of the evidence. Similarly, in his second assignment of error, Taylor argues that his aggravated burglary convictions are contrary to the manifest weight of the evidence.

{¶9} In determining whether a conviction is against the manifest weight of the evidence, a reviewing court must examine the entire record, "'[weigh] the evidence and all reasonable inferences, consider the credibility of witnesses and [determine] whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Thompkins* (1997),

78 Ohio St.3d 380, 387, 678 N.E.2d 541, quoting *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717. A reviewing court must, however, allow the trier of fact appropriate discretion on matters relating to the weight of the evidence and the credibility of the witnesses. *State v. DeHass* (1967), 10 Ohio St.2d 230, 231, 227 N.E.2d 212.

{¶10} The offense of aggravated murder is codified in R.C. 2903.01 and provides, in pertinent part:

> **(A) No person shall purposely, and with prior calculation and design, cause the death of another * * *.**
>
> **(B) No person shall purposely cause the death of another * * * while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit, * * * aggravated burglary, [or] burglary * * *.**

The offense of aggravated burglary is codified in R.C. 2911.11 and provides, in pertinent part:

> **(A) No person, by force, stealth, or deception, shall trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, when another person other than an accomplice of the offender is present, with purpose to commit in the structure or in the separately secured or separately occupied portion of the structure any criminal offense, if any of the following apply:**
>
> **(1) The offender inflicts, or attempts or threatens to inflict physical harm on another;**
>
> **(2) The offender has a deadly weapon or dangerous ordnance on or about the offender's person or under the offender's control.**

{¶11} More than thirty witnesses testified on behalf of the State at trial. We will review the relevant portions of their testimony herein. Penny Rees, the records keeper for the Marion General Hospital, identified State's exhibit three as the emergency room records of Kevin McMurray. (Tr. at 207-08). Deputy Sheriff Scott Lill testified that he received a 9-1-1 emergency call from Rhonda McMurray around 9:21 p.m. on the evening of October 25, 2009 while he was working as a dispatcher. (Tr. at 211-14). Deputy Lill identified State's exhibit 1B as a true and accurate copy of Rhonda McMurray's 9-1-1 call, which was subsequently played for the jury. (Id. at 214-15). Deputy Lill testified that Rhonda was hysterical and very upset on the phone and said that her husband had been shot. (Id. at 215-16). On cross-examination, Deputy Lill testified that he did not hear the entire 9-1-1 phone call, because the call was transferred to Kristen Lehman, the Dispatcher for the Marion City Police Department. (Id. at 216-17).

{¶12} Kristen Lehman's video deposition was played at trial for the jury since she was unavailable to testify at trial. (Id. at 219). Lehman testified during her deposition that she was employed as a Marion City Police dispatcher when she received a 9-1-1 call from Rhonda McMurray on the night of October 25, 2009. (Lehman Depo. at 4, 8). Lehman identified State's exhibit 1A as a copy of Rhonda's 9-1-1 phone call, which was played during Lehman's video deposition. (Id. at 8). Lehman testified that the call was transferred to her from the Marion

County Sheriff's Office since Rhonda called using a cell phone, and wireless (cell) phone calls go to the sheriff's office first. (Id. at 9). Lehman testified that Rhonda told her that Terry Taylor was the perpetrator. (Id. at 10). Lehman identified State's exhibit 2 as the event report for the 9-1-1 call, which indicates that the phone call was received at 9:22 p.m. and that Lieutenant Shenefield and Officer Woods responded to the scene at 9:25 p.m. (Id. at 12).

{¶13} Officer Norm Ratterman of the Marion City Police Department testified that, while working the midnight shift on October 26, 2009, he was helping other officers search for a possible handgun and jacket related to a homicide. (Tr. at 222-24). Officer Ratterman testified that he was able to locate a flannel spring or fall jacket. (Id. at 225). Officer Ratterman then identified State's exhibits 99 and 100 as photographs of the jacket he located. (Id. at 226-27). Officer Ratterman testified that he discovered the jacket near 3172 Highway 309 East on the north side of the road near an area commonly referred to as "The Depot." (Id. at 227, 231). Officer Ratterman testified that the jacket appeared as if it had not been there very long since it was dry and there had been several previous days of rain. (Id.). Officer Ratterman identified State's exhibit 104 as the extra-large multi-colored flannel jacket he located that evening. (Id. at 229-30). Officer Ratterman further testified that the location of the jacket was consistent with someone throwing the jacket out of the driver's side window while heading

309 eastbound to Caledonia. (Id. at 231). On cross-examination, Officer Ratterman testified that a person could have also thrown out the flannel jacket from the passenger's side of a vehicle while heading the opposite direction on 309. (Id. at 232). He further testified that the flannel did not match the color description provided by the witness. (Id. at 238).

{¶14} Patrolman Michael Woods of the Marion City Police Department testified that he received a dispatch around 9:22 p.m. on October 25, 2009 to respond to 283 Oak Street in Marion. (Id. at 242-43). Patrolman Woods testified that he arrived at the scene just after Lieutenant Shenefield arrived, and they went around the east side of the building to a stairway leading to an entrance of the house. (Id. at 243-44). He testified that he observed Rhonda McMurray at the top of the stairway still on the phone with 9-1-1 screaming and hysterical. (Id. at 245). When they approached the stairway, Rhonda stated, "He's inside, he's been shot, please hurry, hurry up." (Id.). Patrolman Woods further testified that there was only one entrance into the residence. (Id. at 246). He testified that they located Kevin McMurray lying on his right side on the living room floor between a couch and a coffee table. (Id. at 247). Kevin was not responding but was breathing raspy at that point, so he told dispatch that the paramedics should come into the house to treat Kevin. (Id. at 248, 258). Patrolman Woods testified that Rhonda's demeanor was hysterical or frantic during the time they were at the home. (Id. at 250).

Patrolman Woods identified State's exhibits 4-13 as photographs of the scene taken the night of October 25, 2009. (Id. at 251). He testified that he located two shell casings: one fell out of Kevin's shirt when the paramedics removed his shirt, and the other one he located by the kitchen table near the home's entrance. (Id. at 255). Patrolman Woods identified State's exhibits 10-13 as photographs of the .25 caliber shell casings found in the home. (Id. at 256-57, 259).

{¶15} On cross-examination, Patrolman Woods testified that a .25 caliber was a smaller caliber. (Id. at 261). He testified that, generally speaking, larger caliber rounds have more gun powder than smaller caliber rounds. (Id. at 262-64). He testified that shell casings generally eject from a gun to the right. (Id. at 264). He further testified that, if a person covers the gun with a plastic bag, the shell casings would be in the bag. (Id. at 265). He did not know whether the shell casings could kick out of the bag, and he testified that the plastic bag could affect the gunshot residue. (Id.). Patrolman Woods testified that he never heard Kevin state that "Terry Taylor" shot him. (Id. at 267). On re-direct, Patrolman Woods testified that he heard Rhonda still screaming while the medics were there, and that Rhonda was consistently asking them to help Kevin. (Id. at 270). He also testified that a shell casing is hot when it is ejected. (Id.).

{¶16} Lieutenant Shenefield of the Marion City Police Department testified that he was dispatched around 9:22 p.m. on October 25, 2009 to 283 Oak Street in

Marion and arrived on the scene at 9:25 p.m. (Id. at 271-73). Lieutenant Shenefield testified that he discovered Rhonda at the top of the stairs crying hysterically, screaming, yelling, and shaking while on the phone with dispatch. (Id. at 274). Rhonda told him that Kevin had been shot and was inside. (Id. at 275). Lieutenant Shenefield testified that he found Kevin lying in the living room in blood gasping for air. (Id. at 276-77). He testified that Rhonda informed them that she had had an affair with Terry Taylor, but that she had ended the relationship and was trying to work things out with Kevin. (Id. at 278). Rhonda was "very distraught," scared, and concerned for Kevin's well-being according to Lieutenant Shenefield. (Id.). He testified that they located three spent cartridges in the home, one near Kevin, one in the kitchen, and one near the wooden table in the living room. (Id. at 283).

{¶17} On cross-examination, Lieutenant Shenefield testified that people often display a lot of emotion when there has been a murder, but that emotion does not necessarily mean they are being truthful. (Id. at 288). He testified that he recognized Kevin and Rhonda from prior contacts with them at the address. (Id. at 289). Kevin did not speak when they arrived at the scene. (Id. at 290). Lieutenant Shenefield testified that a person located at the scene of the crime can be a suspect, at times, depending upon what they discover during the investigation. (Id. at 291). He testified that his report indicates that Rhonda told them that Terry Taylor

walked into the apartment and shot four times. (Id. at 294-95). He also testified that Rhonda told them that Taylor had a white bag over the gun as the shooting occurred. (Id. at 295). Lieutenant Shenefield testified that the shell casings could leave the bag depending upon their speed and the temperature of the spent casings. (Id.). He testified that he located four spent cartridges. (Id. at 296). On re-direct, Lieutenant Shenefield testified that, based upon his experience, people that are hysterical are telling the truth. (Id. at 299). On re-cross, he testified that he believed that Rhonda had lied to him in the past about things involving her son. (Id. at 300).

{¶18} Kevin Pape, a paramedic and firefighter with the Marion City Fire Department, testified that he received a call on October 25, 2009 around 9:24 p.m. to respond to 283 Oak Street. (Id. at 301-06). He testified that he observed a woman in the kitchen with two officers who was "crying, borderline screaming, frantic." (Id. at 308). Pape testified that he discovered a male patient lying on the floor of the living room on his right side by a coffee table. (Id.). Underneath the patient's head was a puddle of blood, and the patient was bleeding from his left arm. (Id. at 309-10). While they were treating the patient, they discovered bullet wounds. (Id. at 312). They determined that the patient's heart was not beating, so they began CPR. (Id. at 313). They transported the patient to the hospital at 9:49 p.m. after being on the scene for 23 minutes. (Id. at 314). Pape testified that, the

patient went into asystole, or flat-lined, when they pulled into the hospital, meaning that he passed away. (Id. at 315-16). Pape testified that they cut the patient's clothes off at the scene so they could expose any injuries he might have. (Id. at 318). He testified that they discovered a shell casing when they were cutting off the patient's shirt. (Id. at 319). On cross-examination, Pape testified that he did not remember who found the shell casing. (Id. at 321).

{¶19} Micky Allen Crump testified that, on October 25, 2009, he was living at 242 Chestnut with his girlfriend, Becky Roush, and his son, Zachery Allen Crump. (Id. at 334-36). Crump testified that he had known Kevin McMurray for about five years, and had known Terry Taylor since July of 2009. (Id. at 336). Crump testified that Kevin and his wife, Rhonda, lived directly behind him in an upstairs apartment. (Id. at 337, 339). He testified that he could see the stairs and landing going to their apartment from his back yard. (Id. at 340). Crump testified that he and his girlfriend were on their front porch around 9:00 p.m. on the night of October 25, 2009, when they saw a turquoise green car come off of Oak Street. (Id.). Crump testified that he had seen Taylor drive that vehicle before. (Id. at 341-42). Crump identified State's exhibits 81-83 as photographs of the car he saw that evening. (Id. at 342-43). Crump testified that, out of curiosity, he got up to go around to his back yard after seeing the car driving slowly past his house. (Id.). Crump testified that he heard "bang, bang, bang" and saw Rhonda

run out of the house on the phone yelling, "help, help, he shot him, Kevin's dead." (Id. at 344). Crump testified that the bangs he heard were gun shots. (Id. at 345). When the police were trying to determine where Taylor might have gone after the shooting, Crump told the police that Taylor had a sister, named Dee, who lived in the Wood Valley trailer park in Caledonia. (Id. at 346-47). Crump testified that he had been sitting on his front porch for probably about an hour prior to the shooting, and that he did not hear any arguing coming from the apartment. (Id. at 347).

{¶20} On cross-examination, Crump testified that he might have heard arguing at the apartment before. (Id. at 351). He did not recall telling a news reporter that Kevin punched Rhonda's teeth out or that their apartment was a "damn circus." (Id.). Crump testified that he did not know about the McMurrays' personal life, and that he had never seen Kevin hit Rhonda. (Id. at 352). He further testified that he heard the McMurrays' door being kicked in that night. (Id. at 352-53). On re-direct, Crump testified that he has no personal issues with Taylor, and that he was trying to tell the truth as best as he could remember. (Id. at 356).

{¶21} Becky Roush, Crump's girlfriend, testified that she lived at 242 Chestnut Street on October 25, 2009, and that the McMurrays lived behind them in an upstairs apartment. (Id. at 358-60). On the evening of October 25, 2009,

Roush was on the front porch with her boyfriend, Micky Crump, when she saw a greenish color car drive past their house. (Id. at 361-63). Roush identified State's exhibits 81-83 as photographs of the car she saw, which looked like a car that Taylor drove. (Id. at 362-63). She testified that about two to three minutes after seeing Taylor's car, they heard the McMurrays' door get kicked in, then "bang, bang, bang," and then heard Rhonda on the cell phone calling 9-1-1 saying, "help, help, he's dead, he's been shot." (Id. at 363). Roush testified that Crump never went around the house, since she told him not to do that. (Id. at 363-64). On cross-examination, Roush testified that she made a written statement to the police, but she agreed that she never put in the statement that she heard the door being kicked in. (Id. at 366, 368). Roush also testified that she did not write in her statement that she heard Rhonda on the cell phone talking to 9-1-1. (Id. at 368). Roush testified that she told the officer she did not realize the sounds she heard were gunshots, even though she knows that now. (Id. at 370). She also testified that Crump never went to their back yard after hearing the shots, because she told him not to do that. (Id. at 370-71). Roush testified that she heard the McMurrays arguing once in a while. (Id. at 373).

{¶22} Jan Gorniak, the Franklin County Coroner, testified that she performed an autopsy on Kevin McMurray and determined that the cause of Kevin's death was four gunshot wounds. (Id. at 379, 382). Gorniak identified

State's Ex. 78 as a certified copy of her autopsy report. (Id. at 383). Gorniak testified that Kevin had been shot in the left side of his neck below his left ear, his right forearm, his left hand, and his left mid upper arm. (Id. at 384-87). Gorniak testified that the gunshot to Kevin's upper arm entered his left chest, perforating Kevin's lungs and heart, which was fatal. (Id. at 387-88). Gorniak testified that Kevin internally hemorrhaged, bleeding into his chest cavity almost half of his total volume of blood. (Id. at 388). Gorniak identified several of the State's exhibits as photographs of the bullets and the gunshot wounds. (Id. at 390-405); (State's Exs. 51, 59, 60, 62, 64-66, 68, 69-72, 75-77). Gorniak could not testify how far away the shooter was from Kevin when Kevin was shot. (Id. at 403).

{¶23} Major Jay McDonald of the Marion Police Department testified he responded to 283 Oak Street after the squad had already left the scene. (Id. at 411-13). Major McDonald testified that he talked with Rhonda, and she was "obviously distressed; she was crying, she was yelling, she was very emotionally upset." (Id. at 414). Major McDonald testified that Rhonda told him that she was sitting on the couch with Kevin when Taylor came into the residence and said, "you know what this is about, bi_ch" and began shooting. (Id. at 415). Major McDonald testified that they learned from Rhonda and others that Taylor might be at the Wood Valley Trailer Park in Caledonia, which is where they ultimately located Taylor. (Id. at 416). He testified that he watched Taylor's interview, and

that Taylor denied being at Kevin's house that night. (Id. at 417). Taylor also indicated that he had been Kevin's best friend since kindergarten, for forty-two years, that he knew Rhonda through Kevin, and that he had an affair with Rhonda. (Id. at 417-18). Taylor further indicated during the interview that he had not spoken with Rhonda since the Tuesday prior to the shooting, and that Rhonda told him she did not want to continue the relationship but wanted to be friends. (Id. at 418). Taylor indicated that he told Rhonda that she had his heart and not to crush it. (Id.). Major McDonald further testified that Taylor indicated that he believed that Kevin had sliced the tires on two of his vehicles and broke into, or attempted to break into, his house. (Id. at 419).

{¶24} After the interview, Major McDonald went to the Wood Valley Trailer Park where he learned that Detectives Elliott and Musser had talked to three witnesses, Adreena Shipman, Elizabeth Shipman, and Candy Bradley. (Id. at 419-20). Adreena was Taylor's sister; Elizabeth was Taylor's niece; and Candy was the Shipmans' neighbor. (Id. at 420). Each of these witnesses agreed that Taylor arrived at the trailer complex at 9:20 p.m. (Id. at 421). However, Major McDonald testified that they were concerned that these witnesses were not being truthful, so he informed them that Kevin McMurray had been killed. (Id. at 420-21). At that point, Elizabeth turned to her mother and told her that she was not going to go down for something her uncle Terry had done. (Id. at 421). Major

McDonald testified that Elizabeth showed him the clothes that Taylor was wearing when he came to the house that he had taken off and placed in the washing machine. (Id.). Elizabeth also pointed out the hand cleaner that Taylor used to wash his hands when he came home. (Id.). Elizabeth was so upset and worried about losing her son over the incident that she began to vomit, according to Major McDonald. (Id.). Elizabeth told Major McDonald that her Uncle Terry told her to say that he arrived at the trailer at 9:20. (Id. at 422). Before leaving with Major McDonald to have a further interview at the police department, Elizabeth told Major McDonald the route that Taylor drove to get from Oak Street to the trailer. (Id.). Elizabeth told Major McDonald that Taylor disposed of the gun and some clothing while in route to the trailer by throwing the items out of his car window. (Id.). Elizabeth also told Major McDonald that Terry told her that the gun had belonged to her deceased Uncle Frank Taylor. (Id. at 423). Elizabeth further told him that Terry admitted to her that he shot Kevin McMurray. (Id.).

{¶25} Major McDonald further testified that they were able to locate a holster, a gun, a coat, and a bag. (Id. at 424). He testified that they towed a green Oldsmobile Cutlass from Wood Valley since that was the car driven by Taylor. (Id.). Major McDonald identified State's exhibits 81-83 as the photographs of the green Oldsmobile Cutlass driven by Taylor. (Id. at 425). Major McDonald testified that, on October 26, 2009, law enforcement took gunshot residue samples

from the steering wheel of Taylor's car and sent the sample to BCI for testing. (Id. at 425-26).

{¶26} On cross-examination, Major McDonald testified that Rhonda's statement that Taylor shot Kevin is what turned the investigation towards Taylor. (Id. at 429). He testified that a gunshot residue test was performed on Rhonda McMurray. (Id. at 433). He was not aware that Rhonda had a towel in her hand when the gunshot residue test was being performed. (Id. at 434). Major McDonald testified that a gunshot residue test was not performed on Rhonda's sweatshirt, though he would have "preferred that that happened." (Id. at 436). He testified that Kevin and Rhonda had some troubles with their relationship, and that he noted in his report that their apartment appeared "in its normal state of disarray." (Id.). Major McDonald testified that Rhonda had filed domestic violence charges against Kevin in June and July of 2009. (Id. at 437). He also confirmed that Rhonda alleged that Kevin violated a temporary protection order that was issued in December. (Id. at 438). Major McDonald testified that Detective Adkins told Taylor during his interview that Kevin identified him as the shooter. (Id. at 446). He further testified that Detective Adkins told Taylor that he was looking at a few years for shooting Kevin in the arm, and that he should confess, even though Detective Adkins knew that Kevin was dead. (Id. at 446-47). Major McDonald testified that they found gloves in Taylor's car but did not have those gloves tested

for gunshot residue since they did not believe they were the gloves Taylor wore that night. (Id. at 448). He testified that they discovered Kevin's DNA on the trigger of the gun, but Rhonda's DNA was not on the trigger. (Id. at 450-51). He testified that they did not find any blood on the clothes that Taylor left at Adreena's trailer, but Major McDonald believed that the clothes had already been washed. (Id. at 455). He testified that there was no blood recovered from the plastic bag, either. (Id. at 455-56). Major McDonald testified that they never found the red cap, which Rhonda indicated the shooter was wearing, nor did Taylor have red hair, as Rhonda indicated the shooter had. (Id. at 459-60).

{¶27} Keith Cox of the Marion City Police Department testified that he arrived at 283 Oak Street at 9:25 p.m. and found Rhonda "very upset, hysterically screaming into the phone." (Id. at 470-72). Patrolman Cox testified that he had to continuously pull Rhonda out of the apartment because she wanted to go into the apartment to see Kevin. (Id. at 472). Rhonda told him that the apartment door was unlocked, Terry came into the living room a couple of feet and stated, "you know what this is for" and started shooting. (Id. at 473-74). When Patrolman Cox asked Rhonda to describe the gun Taylor used, Rhonda indicated that she could not because Taylor had the gun covered with a white plastic bag. (Id. at 474). Rhonda stated that Taylor drove a Ford Ranger pick-up truck or a Cutlass car. (Id. at 475). Rhonda told Patrolman Cox that Taylor might be with his brother, John, who lived

on Gay Street or with his sister, Dee, who lived in the Wood Valley Trailer Park in Caledonia. (Id. at 476). Rhonda stated that Kevin was sitting on the couch when Taylor began shooting. (Id. at 480). On cross-examination, Patrolman Cox testified that he noted in his report that Rhonda stated that Taylor was wearing a red stocking cap, a tan checkered flannel shirt, and blue jeans. (Id. at 494). He also testified that Rhonda indicated Taylor shot four times, then a couple times when he was leaving the apartment. (Id. at 496). Patrolman Cox testified that Rhonda indicated that Taylor tried to shoot her, though he did not put that in his report. (Id. at 498).

{¶28} Rhonda McMurray testified that she was married to Kevin for 17 years, and knew Kevin for 25 ½ years. (Id. at 505-06). Rhonda testified that, on Sunday October 25, 2009, Taylor shot her husband, Kevin. (Id. at 507). Rhonda testified that she was not living with Kevin at the time, but Kevin stopped by the apartment the morning of October 25, 2009 to make her breakfast because she was sick. (Id. at 508-09). Kevin stayed for about an hour and then went to work with his father, Lester McMurray. (Id. at 509). Kevin returned to the apartment about 7:00 p.m. to see how she was feeling and told her that his dad was coming to bring her medicine, since he forgot it in his dad's truck. (Id.). Kevin then told Rhonda that he wanted to take out the garbage, and his dad pulled up when he was outside and gave him the medicine. (Id.). Kevin came back upstairs after his dad left

around 8:30 p.m., they ate dinner, she took her medicine, and they sat on the couch to watch TV a little after 9:00 p.m. (Id. at 509-10). Rhonda testified that, shortly after that, she heard her door bang real loud, and Terry Taylor was standing in the living room. (Id. at 510). She stated, "what the fuck you doing in my house? What the fuck you doing in my house?" and Taylor stated, "you know what I'm doing here, you fucking bitch." (Id.). Rhonda testified that Kevin stood up off the couch, and she heard "pop, pop, pop, pop," and Kevin fell to the ground. (Id. at 511). Rhonda further testified that Taylor stuck the gun in her face but the gun did not fire, and Taylor started backing out of the room, and she was trying to hide. (Id.). As she looked at Taylor again, he pulled the gun again and it went off, and she hit the floor and called 9-1-1 for help. (Id.).

{¶29} Rhonda testified that the apartment door did not lock, so they used a bar across the door frame to secure the door. (Id. at 512). Rhonda testified that Taylor was wearing a toboggan hat, a coat with plaid pleats on it, and jeans, and he had a white bag over his hand when he came through the door. (Id. at 513). Rhonda testified that she never saw the gun, but she saw the cartridges ejecting out of the bag and hitting the floor. (Id.). Rhonda testified that Taylor did not have permission to be in her apartment. (Id. at 514). Rhonda testified that Taylor was within reaching distance of Kevin when he shot him. (Id. at 520). Rhonda testified

that Taylor came to kill both of them. (Id. at 522). Rhonda testified that she called 9-1-1 on a prepaid wireless phone that belonged to Kevin. (Id. at 524).

{¶30} Rhonda testified that she had an affair with Taylor after he moved back to Marion and reconnected with Kevin. (Id. at 526). Rhonda testified that she filed domestic violence charges against Kevin in June and July, but they were still seeing each other and both of them were spending time with Taylor. (Id. at 527). Rhonda testified that the affair started around September 11th or 12th around her birthday after she and Kevin had an argument at Taylor's house and Kevin left her there. (Id. at 528). Rhonda testified that she stayed at Taylor's house that night and had sex with him, and the next morning Kevin saw them in bed together through the bedroom window. (Id. at 529). Rhonda testified that Kevin was furious, called her a "fucking whore," stated that he was done with her, and went home and packed his things and left. (Id.). Rhonda testified that her affair with Taylor lasted no more than a couple of weeks, and she ended it with Taylor around September 25th. (Id. at 530). Rhonda testified that Kevin and she began talking again when he would come to the apartment to collect more of his belongings. (Id. at 531). According to Rhonda, Kevin told her that he wanted to start talking and try to work things out, but he wanted to take things slow. (Id.). Rhonda testified that Taylor tried to come over to her apartment during that time, but she told him that she was done with the relationship, and that she did not want a relationship

with anyone. (Id. at 532). Rhonda testified that she blamed herself for Kevin's death, because she had the affair with Taylor, but she testified that she did not kill her husband. (Id. at 534).

{¶31} On cross-examination, Rhonda testified that she never had a towel in her hand when she was questioned by law enforcement. (Id. at 546). She testified that it was 9:02 or 9:03 p.m. when they were channel surfing on TV, and that Taylor came into the house within 10 minutes of them watching TV. (Id. at 548). Rhonda testified that Kevin did not speak to her after being shot but only made a gurgling sound. (Id.). Rhonda testified that Taylor was wearing a red toboggan, not a red ball cap. (Id. at 549). She testified that she heard the door bang, and, at first, she thought it might have been her son, Jeremy. (Id. at 551). She testified that Taylor shot five times, four at her husband and once as he was leaving the apartment. (Id. at 552). Rhonda testified that the jacket in evidence was not tan, as she thought, but testified that the jacket belonged to Taylor. (Id. at 554). Rhonda testified that she filed domestic violence charges against Kevin in June, and that Kevin should not have been at her house because of the protection order. (Id. at 556). Rhonda testified that she reported in September that Kevin had taken the converter box from the TV in her apartment. (Id. at 558). Rhonda testified that she slept with Taylor a couple of times, but they were never boyfriend and girlfriend. (Id. at 563-64). Rhonda denied being scared of her husband, though admitted they

were having problems. (Id. at 565). Rhonda denied shooting her husband or wanting her husband dead. (Id. at 567). Rhonda denied ever seeing Taylor's gun, though she testified that she had previously seen an outline of the gun in Taylor's back pocket. (Id. at 568). Rhonda testified that her door was not opened by the knob, but was forcefully opened so that the door flung open and hit the wall and came back. (Id. at 569-70). Rhonda testified that she saw the shell casings eject from the plastic bag, since they were melting the bag and coming "out in sparks." (Id. at 573-74).

{¶32} Lieutenant B.J. Gruber testified that he was involved in the homicide investigation at 283 ½ Oak Street. (Id. at 586-87). Lieutenant Gruber identified State's exhibit 34 as a photograph of the entry door to the apartment, State's exhibit 35 as a close-up photograph of the door clasp and locking mechanism, which evidenced recent damage, and State's exhibit 36 as a photograph of the door showing the door knob was missing. (Id. at 597-98). On cross-examination, Lieutenant Gruber testified that he believed that the shell casings could have been kicked by responders coming to the area. (Id. at 616-17). He testified that he noted in his report that the shooter was never any closer than 7 to 8 feet from Kevin and Rhonda. (Id. at 619). He testified that he saw aspirin in one of the pictures of the apartment. (Id. at 622). Lieutenant Gruber testified that there was no way to tell whether the door had been kicked in or not. (Id. at 624).

{¶33} Jennifer Akbar, formerly a forensic scientist in the forensic biology and DNA section, testified that she compared DNA recovered from the trigger, handle, and magazine of the pistol, as well as on the jacket to Taylor and Kevin McMurray's DNA samples. (Id. at 631, 635). Akbar testified that she obtained a partial DNA profile consistent with Kevin McMurray and at least one unknown individual from the trigger of the pistol; however, no conclusions could be made regarding whether Taylor was a contributor to the mixture. (Id. at 639). Akbar testified that the profiles from the pistol's handle and magazine were very limited profiles that were not useful for comparison purposes. (Id. at 640). Akbar testified that the major DNA profile taken from the jacket was from an unknown male, and the minor DNA profile was consistent with Taylor. (Id. at 641). Akbar could not tell whether the major DNA source on the jacket was a relative of Taylor. (Id.). Akbar testified that wearing gloves makes DNA transfer much more difficult, and DNA can be wiped or washed away with any cleaning product or bleach. (Id. at 643). Akbar testified that DNA can remain on an item for decades under the right conditions, and that DNA can be transferred secondarily between objects. (Id. at 644). Akbar identified State's exhibit 118 as the report she prepared for this case. (Id. at 645-46). On cross-examination, Akbar testified that she did not analyze the two plastic, white Wal-Mart bags, a pair of black shoes, the white socks, or a fanny pack that was sent into BCI. (Id. at 654-55). Akbar testified that the gun

and jacket were the first two items to be checked for DNA, and since DNA was obtained from those items, the remaining items were not checked. (Id. at 655). Akbar testified that she did not analyze Rhonda's sweatshirt. (Id. at 658).

{¶34} Terrie Lanier testified that, on October 25, 2009, she was employed at the Chicken Shack and at Rally's on Main Street. (Id. at 662-63). She testified that she knows Taylor, Rhonda, Kevin, and Nathan Laird. (Id. at 663-64). Terrie testified that she was dating Nathan Laird, who was Rhonda and Kevin's son. (Id. at 664). She testified that she asked Taylor to pick up Nathan and her and take Nathan to the hospital and her to work on October 25, 2009. (Id. at 665). Terrie testified that Taylor picked them up in a green car, and Terrie identified State's exhibit 81 as a photograph of Taylor's vehicle. (Id. at 666-67). Terrie testified that Taylor picked her up from work around 8:10 or 8:20 p.m., and that around 9:45 p.m. she texted Taylor to find out what was going on over at Rhonda and Kevin's house. (Id. at 667, 671). Taylor responded that "he didn't have a clue." (Id. at 671). Terrie testified that she saw a silver gun with a white handle in the glove compartment of Taylor's truck. (Id. at 677-78). Terrie testified that Taylor knew that Nathan would not be at Rhonda's place the night of the incident, because she had advised him that Nathan was at Grant Hospital. (Id. at 678). On cross-examination, Terrie testified that she knew about one fighting incident between

Kevin and Rhonda. (Id. at 681). On re-direct, Terrie testified that Taylor was texting her on his sister's cell phone, and his sister lives in Caledonia. (Id. at 692).

{¶35} Elizabeth Mathias, formerly Shipman, testified that she lives at 129 Center Street in Caledonia with her mother, her husband, and two-year-old son. (Id. at 693). Elizabeth testified that Adreena Shipman is her mother and Taylor's sister, Taylor is her uncle, and Edna "Candy" Bradley is her godmother. (Id. at 694, 698). Mathias testified that, on October 25, 2009 around 9:30 p.m., Adreena received a phone call informing her that Taylor had been shot, so Adreena left the house to go to the hospital when Taylor came walking towards her from Mathias' grandmother's green car. (Id. at 696-99). Mathias testified that she ran out of the house and gave Taylor a hug and told him about the phone call, and Taylor told Adreena that he needed to talk to her. (Id. at 699). Mathias identified State's exhibits 81 and 82 as photographs of her grandmother's car. (Id. at 700). According to Mathias, Taylor asked for some bleach to wash his hands when he walked into the house. (Id. at 701). Mathias could not find any bleach at her house, so she went over to Candy's house and retrieved some mechanic's hand degreaser for Taylor. (Id.). After Taylor washed his hands, he spoke with Adreena on the front porch, and Mathias overheard Adreena say, "I don't want to hear anything" or "I don't want to know anything," and Adreena came back into the house. (Id. at 703). Mathias testified that, right before Taylor talked to Adreena,

Taylor pointed to each of them and asked them "I was here at 9:20, right"? (Id. at 704-05). Taylor also commented that there was "five of us" and only "two of them," referring to witnesses. (Id. at 705).

{¶36} Mathias testified that she saw Taylor texting someone on her mother's cell phone later that evening. (Id. at 706). Mathias testified that, after her mother went to bed, she asked Taylor what had happened that night. (Id. at 707). Taylor told her that he was in the alley by Kevin and Rhonda's house wearing a hooded sweater or jacket; that he was holding his hands out in front of him with her Uncle Junie's gun in his hands. (Id. at 707). Taylor further stated that he was going down for attempted murder, because he walked up to Kevin, said "I'm here for this" and he shot Kevin five times. (Id. at 708). Taylor told Mathias that Rhonda came in screaming "are you okay" to Kevin, and he lifted the gun up to her but he ran out of bullets. (Id.). When Mathias asked about fingerprints on the gun, Taylor told her not to worry because he was wearing gloves and that the gun was in a bag. (Id.). When Mathias asked Taylor why he had shot Kevin, Taylor indicated that Kevin slashed the tires on the cars at her grandmother's house and tried to break into the window of the bedroom that Adreena sleeps in when she stays there. (Id. at 709). Taylor told Mathias that Adreena should take his car to work, and that she should use her mom's car to find the gun, which was somewhere around 309 or Fairground. (Id. at 710). Taylor told Mathias that he

threw the gloves, the jacket, and the gun out of the car window on his way to their house. (Id.).

{¶37} Mathias testified that Uncle Junie was Taylor's oldest brother Franklin Taylor, who passed away in October 2008. (Id.). Mathias told Taylor that she would find the gun, and Taylor told her to "just wipe it off with a shirt and throw it back" since he did not want it anywhere near him. (Id. at 711). Mathias testified that Taylor asked for something to calm his nerves, so she went over to a neighbor's house to get something when she saw several police officers with dogs, but she figured they were searching for drugs. (Id. at 711-12). When she went back into the house, Mathias told Taylor about seeing the police, and Taylor decided to change his pants, so Mathias gave Taylor a pair of her mom's sweatpants to wear. (Id. at 712). Mathias testified that either Taylor or she placed his clothes into the washing machine, and she washed Taylor's clothes. (Id. at 713). Mathias testified that they went back into the living room, turned off the lights, opened a window, lit a candle, and sat listening for the police to come to the house. (Id. at 713-14). Mathias testified that the police knocked on the door, and she told Taylor that she was going to answer it. (Id. at 714). Mathias testified that Taylor had talked to Candy earlier about hiding a gun holster, and that Candy refused to hide it. (Id. at 716). Mathias testified that she wrote out a statement for

the police indicating that Taylor showed up between 9:15 and 9:20 p.m., which was false. (Id. at 717).

**{¶38}** Mathias testified that Major McDonald arrived at their house and informed her mother, Candy, and her that Taylor was being charged with the murder of Kevin McMurray. (Id. at 719). At that point, Mathias turned to her mother and said, "I can't lie for him on something like this. I have a son. I can't lie for him." (Id.). Mathias testified that she then told one of the officers what Taylor had told her that night. (Id. at 719). Mathias also testified that she wrote out another written statement, which she identified as State's exhibit 94. (Id. at 722). Mathias also identified State's exhibits 85 and 86 as the blue jeans and t-shirt that Taylor was wearing when he arrived at the house, which she had washed before the police arrived. (Id. at 723).

**{¶39}** On cross-examination, Mathias testified that Taylor was not wearing a red stocking hat, cap, or toboggan, nor did he mention that he was wearing one. (Id. at 724). Mathias testified that her mother wanted her and her husband out of the house, and that Taylor was a part of that dispute; however, she did not know that Taylor wanted her out of the house until after he was arrested. (Id. at 724-25). Mathias testified that she wrote about the incident in the MySpace journal. (Id. at 727). Mathias testified that, on the night of Taylor's arrest, she told the prosecutor that her husband was in jail for child support, and that the prosecutor suggested

-30-

that he could maybe help get her husband out of jail early to support her through this event. (Id.). Mathias testified that her husband did not get out of jail. (Id.). Mathias testified that she had indicated that she was married in her MySpace journal entry dated November 17, 2009, even though she did not get married until February 12, 2010. (Id. at 730). Mathias testified that she thought Taylor shot Kevin in the alley, not in the house, though she later found out that is what had happened. (Id. at 731). Mathias admitted that after she wrote the journal entry she went to get a joint. (Id. at 732). Mathias testified that she was told that she would not get into trouble if she wrote out a second truthful statement. (Id. at 734-35). She also testified that she was not very close with her uncle Taylor. (Id. at 735). She testified that Taylor never stated that Rhonda killed Kevin, and that she did not observe any blood on Taylor's clothing. (Id. at 737).

{¶40} Tonya Malone testified that she lived at 128 Center Street, Caledonia, Ohio, and that her mother's name is Edna Bradley. (Id. at 742). Malone testified that, around 9:45 or 10:00 p.m. on October 25, 2009, Elizabeth came over to her parents' house to ask if her parents had any hand cleaner or bleach. (Id. at 743-44). Malone testified that she went back over to Elizabeth's house and saw Taylor washing his hands in the sink. (Id. at 744). Malone testified that she walked over to Taylor and jokingly asked, "so who'd you kill?" and Taylor stated, "I don't own a gun" and chuckled a little bit. (Id. at 745). Then

Taylor stated, "but if the police come, I was here at 9:20, right?" (Id.). Then Taylor asked to speak with Malone's mom and Adreena outside. (Id.). Malone testified that she walked outside to leave, and she saw Taylor handing her mother a gun holster and heard Taylor asking her mom to put it in the next door neighbor's trash. (Id. at 746). Malone testified that her mom refused to touch the gun holster, and that she told her mom she was going home to go to bed. (Id.). Malone testified that her mom told the police that Taylor arrived at 9:20, but she did not talk to the police. (Id. at 747).

{¶41} Edna Bradley testified that Elizabeth came over to her house asking for hand cleaner or bleach for Taylor. (Id. at 752). Bradley identified State's exhibit 87 as the hand cleaner she provided for Taylor, and she testified that she witnessed Taylor use it to wash his hands. (Id. at 753). Bradley testified that she asked Taylor if he was in a fight, and Taylor stated, "something like that." (Id. at 754). Bradley testified that she asked Taylor what the guy looked like, and Taylor stated, "Kevin's okay." (Id. at 755). She responded "Kevin, isn't that your best friend?" and Taylor stated, "yeah, Kevin's okay, we made up before I left." (Id. at 755). Bradley testified that Taylor grabbed something from the back seat of his car, and asked her to get rid of it. (Id.). She asked him what it was, and he responded "it's a gun holster," and she told Taylor to get rid of it himself, so he put it in the neighbor's trash bag. (Id.). Bradley testified that she first told the

police that Taylor arrived at 9:20, but that was not true. (Id. at 758). Bradley testified that she told the officers the truth after she learned that Kevin was dead. (Id. at 759). On cross-examination, Bradley testified that Taylor was acting normal, and that she did not see any blood on his clothes. (Id. at 769).

{¶42} Lester McMurray testified that his son was Kevin McMurray, and that he worked with Kevin on October 25, 2009. (Id. at 780). McMurray testified that Rhonda was sick, so Kevin was going to get Rhonda something to eat after they finished working, and Kevin asked him to get Rhonda some aspirin at the store. (Id. at 781). McMurray testified that he returned to the apartment with some aspirin and some hot dogs around 7:40 or 7:50 p.m. and saw Kevin taking the trash out. (Id. at 782). McMurray testified that Kevin and Rhonda had had some problems, but Kevin was staying with Rhonda the week before he was killed. (Id. at 783-84).

{¶43} Officer Steven Chase testified that, on October 22, 2009, Kevin McMurray reported that the tires on his pickup truck were slashed, and that he believed that Taylor was the one who did it. (Id. at 788-90). Officer Chase also testified that Rhonda talked to him about receiving text messages or phone calls from Taylor. (Id. at 790). On cross-examination, Officer Chase testified that he has responded to Oak Street several times for fights between Kevin and Rhonda. (Id. at 792).

{¶44} Robert Moats, Marion City Streets and Sanitation Superintendent, testified that trash pick-up for Oak Street was scheduled for Mondays, with no exceptions for holidays. (Id. at 796-98)

{¶45} Ray Goodson, the Retail Sales Manager for Verizon Wireless, identified State's exhibit 132 as the phone records for cell phone number 740-751-2910 from October 18, 2009 to October 26, 2009. (Id. at 801-03). He identified State's exhibit 133 as the phone records for cell phone number 740-262-3958 from those same dates. (Id. at 803). On cross-examination, Goodson testified that he was unaware who owned the cell phones in the reports. (Id. at 804).

{¶46} Adreena Shipman testified that she lives with her daughter, Elizabeth, Elizabeth's husband, Curtis Mathias, and her grandson, Corbin Mathias at 129 Center Street, Caledonia in the Wood Valley Estates trailer park. (Id. at 807-08). Shipman testified that Taylor was her youngest brother, and that her older brother, Franklin Taylor, was deceased. (Id. at 808). Shipman testified that Franklin went by the name of "Junie" sometimes. (Id. at 809). She further testified that Candy Bradley was one of her best friends, and that Candy lived with her daughter, Tonya, at 128 Center Street in the Wood Valley Estates. (Id. at 809). Shipman testified that, on Sunday October 25, 2009, Taylor showed up at her trailer without calling her beforehand. (Id. at 810). Shipman testified that her other brother, John, had called her earlier that night and said that they had heard

on the police scanner that Taylor had been shot. (Id. at 811). Shipman testified that she received this phone call on her cell phone around 9:32 p.m., and that her cell phone number was 740-262-3958. (Id. at 812). Shipman testified that she was headed out the door to go to the hospital to find Taylor, when Taylor pulled up in her mom's car. (Id. at 813). Shipman testified that Taylor arrived between 9:35 and 9:40. (Id.). Shipman identified State's exhibits 81 and 82 as photographs of her mother's car. (Id. at 814). Shipman testified that Taylor moved into their mother's house at 347 Avondale a few weeks before their mother passed away. (Id. at 815). She further testified that her other brother, Franklin, had lived at their mother's house and that Taylor would have had access to Franklin's clothing. (Id.). Shipman testified that, when Taylor arrived at her trailer, she hugged him and told him about the phone call she received from their brother John, and Taylor said that he was not shot. (Id. at 816). Taylor asked her if she wanted to know what happened, and Shipman told him "no, don't tell me anything. I don't want to know." (Id.). Shipman testified that, after they went inside, Taylor asked for bleach or hand sanitizer to wash his hands. (Id. at 817). Shipman testified that Taylor asked Tonya, Beth, Candy, and her to say that he arrived at the house around 9:20 p.m., which she found strange. (Id. at 819-20). After she went to bed, Elizabeth came into her room and asked her for a pair of sweatpants for Taylor to wear while they washed his clothes. (Id. at 822). Shipman testified that she

-35-

originally wrote in her police statement that Taylor had already arrived at her house when she received the phone call from her brother around 9:32 p.m., though that was not true. (Id. at 824). Shipman testified that, when Major McDonald told them that Kevin was murdered, her daughter, Elizabeth, told her that she had her son to think about and she had to tell the truth. (Id. at 826).

{¶47} On cross-examination, Shipman testified that she was having troubles with Elizabeth prior to this incident. (Id. at 831). She testified that, a couple weeks before this incident, she and Taylor went to a lawyer to inquire about having Elizabeth and her boyfriend evicted out of her house. (Id. at 832-34). Shipman testified that Elizabeth did not know about the possible eviction at that time, but that Elizabeth knew that Taylor and she were trying to evict her on the day of the incident. (Id. at 834). She testified that she did not see any blood on Taylor's clothing or his hands the night he came to the trailer. (Id. at 836-37). Shipman testified that Elizabeth is "not very truthful," and that Elizabeth has a bad reputation. (Id. at 839, 841).

{¶48} Detective Mark Elliott testified that he found and arrested Taylor at 129 Center Street. (Id. at 845, 849). After arresting Taylor, Detective Elliott talked with Adreena, Elizabeth, and Candy but did not believe that they were being truthful since their stories conflicted. (Id. at 854). After Major McDonald informed them that Kevin McMurray died and that Taylor was a suspect, the

women all began to cry, and Elizabeth and Candy indicated that they had lied. (Id. at 855). Detective Elliott testified that Elizabeth told him that she had washed Taylor's jeans and t-shirt, and that Taylor washed his hands. (Id. at 856). Detective Elliott further testified that Candy told him about the gun holster that Taylor put into the neighbor's trash. (Id. at 862). Detective Elliott testified that he located the gun holster and a fanny pack in the neighbor's trash. (Id. at 862, 864); (State's Exs. 88-92). He testified that the fanny pack had the name "Frank Taylor" on it. (Id. at 866-67); (State's Ex. 95).

{¶49} Elizabeth Hutton-Taylor testified that she was married to Franklin Taylor, Jr., Taylor's brother, for four years before they divorced in August of 1994. (Id. at 894-96). Elizabeth testified that State's exhibit 105 was the firearm that she gave to Franklin. (Id. at 897). Elizabeth testified that Franklin told her that they had to put six bullets into the gun's magazine or it would jam. (Id. at 898). Elizabeth identified State's exhibit 104 as Franklin's jacket. (Id. at 898).

{¶50} Zeth Taylor testified that Franklin Taylor was his father. (Id. at 899). He testified that he used to live on Avondale with his father and grandmother, and that his father's clothes were at the house. (Id. at 900-01). He testified that his dad went by "Junie" sometimes, and he identified State's exhibit 104 as his dad's favorite jacket, which was at the house on Avondale where Taylor would have had access to it. (Id. at 901). Zeth testified that he gave Taylor a silver gun with pearl

handgrips that was originally owned by his father, which Zeth identified as State's exhibit 105. (Id. at 903). Zeth testified that the gun had a black holster with it, which he identified as State's exhibit 95. (Id. at 904). Zeth also testified that he gave Taylor the fanny pack and lighter case found with the gun, which items originally belonged to his father. (Id.).

{¶51} Ted Manasian, a forensic scientist at BCI, testified that he located gunshot residue on the two Wal-Mart bags, the flannel jacket, and a sample taken from Rhonda McMurray, but did not locate gunshot residue from the sample taken from Taylor. (Id. at 910, 918-22). Manasian testified that no gunshot residue could be found if a person wears gloves while operating a firearm or if the person washes their hands after operating the firearm. (Id. at 922-23). Manasian further testified that he located gunshot residue from samples taken from the steering wheel of Taylor's car. (Id. at 923-24).

{¶52} James Smith, a forensic scientist at BCI, testified that he examined the firearm and cartridges involved in this case, and determined that the recovered rounds fired at the scene of the crime were, in fact, fired from the gun submitted to the lab for analysis, State's exhibit 105. (Id. at 944, 955-57). Smith identified State's exhibit 121 as a copy of his report containing those findings. (Id. at 958). On cross-examination, Smith testified that he could have determined the distance the shooter was from the victim, but he was not asked to do that. (Id. at 960).

Smith testified that the gun's magazine held six rounds, and that the gun did not jam when he test fired it. (Id. at 964).

{¶53} Cassandra Agosti, a forensic scientist at BCI, testified that Rhonda McMurray's DNA could be excluded as a contributor to the samples taken from the trigger of the firearm and the flannel jacket. (Id. at 970-71, 975).

{¶54} Detective Dan Ice testified that the police found three shell casings at the scene of the crime. (Id. at 981, 983). He further testified that Detective Musser and he located a small, silver .25 Auto Bauer handgun and a Wal-Mart bag just west of route 23 on Fairground Street. (Id. at 984, 986). He testified that the Wal-Mart bag had black markings around several holes in the bag, which appeared to be gunpowder burn marks. (Id. at 985). Detective Ice identified State's exhibits 107 and 109, respectively, as photographs of the handgun and plastic bag he located. (Id. at 986-87). Detective Ice testified that the handgun and the bags were located on the north side of the road, which was consistent with someone throwing them out of the driver's side door of a vehicle heading east on Fairground. (Id. at 989). He testified that it took him approximately 16 minutes to travel from Oak Street to the trailer park where Taylor was found. (Id. at 990-92).

{¶55} Patrolman Rob Musser testified that he spoke with Becky Roush and Micky Crump as part of the investigation, and they informed him that they saw a green Olds Cutlass, which they recognized as Taylor's grandmother's car, driving

slowly from Oak Street to Chesnut. (Id. at 1006-08). Patrolman Musser testified that they told him that they heard a few loud noises. (Id. at 1008). Roush and Crump informed him that Taylor's sister, Dee, lived in the Wood Valley Trailer Park near Caledonia. (Id.). Patrolman Musser testified that he secured the Olds Cutlass for a search. (Id. at 1010). He testified that he interviewed Elizabeth, and that she admitted to lying to him initially about what had happened. (Id. at 1011). He testified that Elizabeth told him that Taylor arrived at the trailer after 9:30 p.m. and that Taylor washed his hands when he arrived. (Id.). Elizabeth told him that she initially lied because Taylor was her uncle, but she did not want to lie anymore after finding out that Kevin was dead and fearing that she could lose her children. (Id. at 1012). Patrolman Musser also confirmed several other parts of Elizabeth's story as testified to by several other officers already. (Id. at 1012-15). Patrolman Musser further testified that Zeth Taylor told him that he gave his dad's small caliber, chrome pistol to Taylor. (Id. at 1016). Elizabeth told him that Taylor shot Kevin and turned the gun on Rhonda but there were no bullets left in the gun. (Id. at 1019). He testified that the trip to the trailer park took him about 13 ½ minutes on the way there and 15 minutes on the way back. (Id. at 1021). On cross-examination, Patrolman Musser testified that Crump did not mention being in his back yard when the incident took place, and Crump did not mention hearing the sound of a door being kicked in. (Id. at 1032).

{¶56} Detective Chris Adkins testified that he interviewed Rhonda around 10:35 p.m. after she learned that Kevin died. (Id. at 1045, 1048). Rhonda stated that she was in the apartment with Kevin watching TV when Taylor came into the apartment and shot Kevin. (Id. at 1049-50). She stated that Taylor had some bags over his hands, and that she could see sparks coming from the bags when Taylor was shooting. (Id. at 1050). Rhonda further stated that Taylor pointed the gun at her as well. (Id.). Detective Adkins testified that he interviewed Taylor, and told Taylor that Kevin had identified him as the shooter, and that Kevin was going to be alright, which was a lie. (Id. at 1057-58). Taylor denied shooting Kevin. (Id. at 1058). Taylor stated that he had known Kevin for 42 years, and they were best friends. (Id.). Taylor also admitted to having an affair with Kevin's wife, Rhonda. (Id.). Detective Adkins testified that Taylor initially had no reaction to being charged with Kevin's murder, but that Taylor began to cry when he was placed into the police cruiser. (Id. at 1060). On cross-examination, Detective Adkins testified that the evidence never led to Rhonda being a suspect. (Id. at 1087). He testified that Rhonda had a couple Marion General Hospital towels in her hand during the interview. (Id. at 1090). He testified that Rhonda stated that the apartment door was not locked when Taylor entered the apartment. (Id. at 1101). He testified that Rhonda stated that the door "swung open," but did not mention that the door was kicked in. (Id. at 1102).

{¶57} Thereafter, the State rested, and the defense called Patrolman Rob Reed to the stand. (Id. at 1148, 1167). Patrolman Reed testified that, on October 19, 2009, he responded to a call at 283 ½ Oak Street. (Id. at 1168). He testified that he had been to the residence several times before for disturbances and warrant checks for Kevin, Rhonda, and their son, Nate. (1169-70). When he arrived on the scene, he found Rhonda out in the alley, and she advised that a TV converter box was taken from the apartment. (Id. at 1171). Rhonda further advised that Kevin had a key, so he could have taken it, and that she had a restraining order against Kevin. (Id.). Rhonda further advised that she had spent the night before at a friend's house because she was afraid to stay at home by herself. (Id. at 1172).

{¶58} Terry Taylor testified that, on October 25, 2009, he was residing at his mother's house at 347 Avondale, and that he had resided there since December 2008. (Id. at 1193-94). Prior to that, he lived in the Carolinas for 22 years. (Id. at 1194). He testified that he met Kevin when he was in kindergarten in Marion, and they became friends through school. (Id. at 1195-96). During the 22 years Taylor was in the Carolinas, he did not communicate with Kevin. (Id. at 1197). He testified that he knew Rhonda as Kevin's wife. (Id.). Taylor testified that he returned to Marion two weeks before his mother passed away from cancer to help take care of her. (Id. at 1198). After his mother died, he continued to reside in her home to settle the estate. (Id. at 1199). Taylor further testified that his nephew,

Zeth Taylor, stayed with him in June and July of 2009. (Id. at 1201). Taylor identified State's exhibit 105 as his brother's gun that his nephew, Zeth Taylor, gave him. (Id. at 1202). Taylor testified that he did not carry the gun, but kept it at the house, and he testified that the gun came with the holster and fanny pack that was identified in court. (Id. at 1203). Taylor testified that he had the holster and fanny pack in his mother's teal green Olds Cutlass. (Id.).

{¶59} Taylor testified that he went over to Kevin's house in May 2009 to re-establish their friendship. (Id. at 1206). Taylor testified that he began hanging out with Kevin and Rhonda about once a week, and that during that time he witnessed Kevin and Rhonda argue almost constantly. (Id. at 1206-07). Taylor testified that one night Kevin left Rhonda at his house following an argument, and Rhonda and he had sex. (Id. at 1208). Taylor testified that Kevin returned the next day to the house and saw them together in bed through the bedroom window. (Id.). Taylor testified that Kevin was very upset, and that, within a day or two, Kevin moved out of the apartment he shared with Rhonda to 173 David Street. (Id. at 1209). Taylor testified that Rhonda filed domestic violence charges against Kevin in May, and she had a protection order against him. (Id. at 1210-11). Taylor testified that Rhonda called the police on September 20, 2009, because her TV converter was missing from the apartment. (Id. at 1211-12). According to Taylor, Rhonda stayed at his house the night before. (Id.). Taylor testified that the

apartment door was locked on the outside with a padlock, and that Rhonda used a key to get into the apartment the day she noticed the TV converter missing. (Id. at 1212-13). Taylor testified that Rhonda was scared to stay at the apartment by herself after the TV converter was missing, and so he gave her the gun that had belonged to his brother, Frank Taylor. (Id. at 1215). Taylor testified that he has not seen the gun since that time until October 25, 2009. (Id. at 1216). Taylor testified that he had never shown the gun to Kevin. (Id. at 1217). Taylor further testified that he and Rhonda had a relationship after sleeping together, and that eventually Rhonda broke off the relationship. (Id. at 1217-18). Taylor denied ever threatening Rhonda or calling or texting or following Rhonda after she ended the relationship. (Id. at 1218-19). Taylor testified that he thought that Kevin sliced his tires and broke into his house, because Kevin was upset with him for sleeping with his wife. (Id. at 1219). Taylor testified that he thought about making amends with Kevin. (Id. at 1221).

{¶60} Taylor testified that he was going through some of his mother's belongings from noon to 3:00 p.m. on October 25, 2009. (Id. at 1223). Around 3:00 p.m., he took Nathan's girlfriend, Terrie Lanier, to the Chicken Shack on Main Street where she worked. (Id.). Taylor testified that Nathan rode with them, and he was going to take Nathan to Marion General Hospital. (Id. at 1224-25). Taylor testified that he told Nathan to call him when he was done at the hospital,

and he was supposed to pick up Terrie from work around 8:00 p.m. (Id. at 1226). Taylor testified that he went home after that to sort through more of his mother's belongings, and then picked up Terrie between 8:10 and 8:20 p.m. (Id. at 1227). Taylor testified that they left the Chicken Shack around 8:15 to 8:20 p.m., and he took Terrie to McDonalds to get food for her children. (Id. at 1229). Taylor testified that Terrie was trying to help him get a job at Rally's where she worked a second job. (Id. at 1230-33). Taylor testified that he had tried to find employment but had difficulty due to his felony record for second degree burglary and assault and battery. (Id. at 1233).

{¶61} After he dropped off Terrie at her house around 8:35 or 8:40 p.m., he decided to go to Kevin and Rhonda's apartment around 9:00 p.m. to make amends with Kevin. (Id. at 1236-37). Taylor testified that when he reached the house he walked up the steps and knocked on the door. (Id. at 1246). Taylor testified that Rhonda opened the door hysterical with a white bag in her hand, and she shoved it into his stomach and said "take this and get out of here. Go. Get out of here." (Id.). Taylor testified that Rhonda closed the door before he could say anything, and he looked in the bag, saw the gun he had given to her, and panicked. (Id.). Taylor testified that he never tried to force his way into the apartment. (Id.). Taylor testified that he noticed the burn holes in the plastic bags that looked like gun shots and he panicked, because he could not have the gun as an ex-felon. (Id. at

-45-

1248). Taylor denied being in the apartment that night, and he denied killing Kevin. (Id. at 1250). Taylor testified that he threw out the gun and the bags from his car as he traveled to his sister's house. (Id. at 1251). Taylor testified that he held the gun in his hand as he was driving before he threw it out of the car. (Id.). Taylor testified that he threw out his jacket because he thought it might have gunshot residue on it from the gun and bags that Rhonda thrust into his chest. (Id. at 1253). Taylor admitted to disposing of the evidence involved in the crime, though he testified that he did not realize a crime had been committed at that time. (Id. at 1255). Taylor testified that he arrived at the trailer park around 9:35 p.m. (Id. at 1256).

{¶62} Taylor further testified that his relationship with his niece, Elizabeth, was not a good one. (Id. at 1257). Prior to the incident, Taylor helped Adreena, Elizabeth's mom, try to evict Elizabeth from her trailer. (Id. at 1258). Taylor testified that Elizabeth was aware that he was helping her mom kick her out of the trailer. (Id. at 1259). Taylor testified that he asked his sister, his niece, and their neighbor to lie for him and say that he arrived at 9:20 p.m. (Id. at 1260). Taylor testified that he asked for hand cleaner in order to get any gun residue off his hands from the bags. (Id. at 1261). Taylor denied telling Elizabeth that he shot Kevin and testified that he told Elizabeth that he thought Rhonda shot Kevin. (Id. at 1262). Taylor testified that Elizabeth lied about him, because he was helping

her mother kick her out of the trailer. (Id. at 1265). Taylor testified that he asked officers several times why he was being arrested, but they never told him. (Id. at 1266-67, 1269).

{¶63} Thereafter, the defense rested, and the matter was submitted to the jury. (Id. at 1336, 1444).

{¶64} After reviewing the aforementioned testimony, as well as the admitted exhibits, we cannot conclude that Taylor's conviction for aggravated murder was against the manifest weight of the evidence. Taylor argues, as he did at trial, that Rhonda had more of a motive to shoot Kevin than he did, because of Kevin's physical violence against her. While the jury heard evidence of the domestic violence between Rhonda and Kevin, the jury also heard evidence of how Taylor had an affair with Rhonda, and how Rhonda had decided to end the affair and try to repair her marriage with Kevin. This testimony provides Taylor with a motive to murder Kevin, as well. Aside from Rhonda's eyewitness testimony that Taylor shot and killed Kevin, two independent witnesses, Crump and Roush, placed Taylor at the scene of the murder shortly before it occurred. Crump also testified that he heard several loud bangs shortly after seeing Taylor drive by his house. Furthermore, the evidence demonstrated physical damage to the apartment door, which tends to corroborate Rhonda's testimony rather than Taylor's testimony that Rhonda opened the door and handed him the gun.

-47-

{¶65} Additionally, Taylor's actions at Adreena's trailer are indicative of his guilt. Taylor immediately asked for hand cleaner or bleach to wash his hands, and he asked Elizabeth to wash his clothing. Taylor asked Adreena, Elizabeth, Tonya, and Edna to say that he arrived at the trailer at 9:20 p.m., even though he arrived after 9:30 p.m. Taylor also asked Edna to dispose of a gun holster and fanny pack that was in his car. Furthermore, Taylor's niece, Elizabeth, testified that Taylor admitted to her that he had shot Kevin several times, and Taylor told her that he was going to be charged with attempted murder. Elizabeth also testified that Taylor told her where he threw out the handgun, plastic bags, and flannel jacket on his way to the trailer. Law enforcement officers located these same items where Elizabeth indicated Taylor told her they were. Aside from the testimony, forensic evidence demonstrated that Rhonda's DNA was excluded as a contributor to the DNA on the trigger of the gun and the flannel jacket, but Taylor's DNA was located on the flannel jacket discarded from the vehicle. Based upon this evidence, we cannot conclude that the jury clearly lost its way by convicting Taylor of aggravated murder.

{¶66} We also cannot conclude that Taylor's conviction for aggravated burglary was against the manifest weight of the evidence. The evidence presented demonstrated that Taylor forced his way into Rhonda's apartment while Rhonda and Kevin were inside for the purpose of shooting and killing at least Kevin.

Taylor did not have permission to be in the apartment. The physical evidence demonstrated recent damage to the apartment door. Taylor inflicted physical harm upon Kevin, and Taylor was carrying a firearm at the time of the offense. Accordingly, the jury did not create a manifest injustice by convicting Taylor of aggravated burglary.

{¶67} Taylor's first and second assignments of error are, therefore, overruled.

## ASSIGNMENT OF ERROR NO. III

**THE TRIAL COURT ERRED TO THE PREJUDICE OF DEFENDANT-APPELLANT BY ALLOWING LIEUTENANT SHENNEFIELD [SIC] TO TESTIFY TO RHONDA MCMURRAY'S TRUTHFULNESS.**

## ASSIGNMENT OF ERROR NO. IV

**THE TRIAL COURT ERRED TO THE PREJUDICE OF DEFENDANT-APPELLANT BY LIMITING HIS EXAMINATION OF JENNIFER SHIPMAN REGARDING ELIZABETH SHIPMAN'S CHARACTER FOR UNTRUTHFULNESS.**

## ASSIGNMENT OF ERROR NO. V

**THE TRIAL COURT ERRED TO THE PREJUDICE OF DEFENDANT-APPELLANT BY LIMITING HIS EXAMINATION OF JONATHON TAYLOR SR. REGARDING ELIZABETH SHIPMAN'S CHARACTER FOR UNTRUTHFULNESS.**

## ASSIGNMENT OF ERROR NO. VI

**THE TRIAL COURT ERRED TO THE PREJUDICE OF DEFENDANT-APPELLANT BY LIMITING HIS EXAMINATION OF JONATHON L. TAYLOR, JR. REGARDING ELIZABETH SHIPMAN'S CHARACTER FOR UNTRUTHFULNESS.**

**ASSIGNMENT OF ERROR NO. VII**

**THE TRIAL COURT ERRED TO THE PREJUDICE OF DEFENDANT-APPELLANT BY LIMITING HIS EXAMINATION OF ADREENA SHIPMAN REGARDING ELIZABETH SHIPMAN'S CHARACTER FOR UNTRUTHFULNESS.**

**{¶68}** In his third assignment of error, Taylor argues that the trial court erred by allowing Lieutenant Shenefield to testify over objection that, based upon his experience, hysterical people tell the truth. In his fourth, fifth, sixth, and seventh assignments of error, Taylor argues that the trial court erred by failing to allow testimony from four different witnesses concerning Elizabeth Shipman's character for untruthfulness.

**{¶69}** As a general matter, trial courts have discretion to determine whether to admit or exclude evidence. *Krischbaum v. Dillon* (1991), 58 Ohio St.3d 58, 66, 567 N.E.2d 1291. As such, we will not disturb the trial court's decision absent an abuse of discretion. Id. An abuse of discretion suggests the trial court's decision is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 450 N.E.2d 1140.

{¶70} With regard to Taylor's third assignment of error, Taylor's attorney questioned Lieutenant Shenefield during cross-examination as follows:

> **Q: And based on your training as an Officer and the cases you've handled as well as your being the head of the Detective Bureau for 10 years, people show emotion a lot when there's been a murder or a crime, don't they?**
> **A: That is correct.**
> **Q: The loved ones show emotion?**
> **A: That's correct.**
> **Q: But emotion and making statements doesn't necessarily mean they're telling the truth, does it, based on your experience?**
> **A: That is correct.**
> **Q: And you've had that happen to you over the years, haven't you?**
> **A: When people are that hysterical I found that they are telling the truth based upon my experience.**

(Tr. at 288). On redirect examination, the State questioned Lieutenant Shenefield as follows:

> **Q: Mr. Ratliff asked you about "well, you know, you got the person who's crying" and this and that "and they sometimes aren't telling the truth," correct?**
> **A: Correct.**
> **Q: But based upon Rhonda's behavior did you believe she was telling the truth?**
> **MR. RATLIFF: Your Honor, we'll object.**
> **THE COURT: I'll sustain the objection.**
> **MS. MARTIN: He opened the door.**
> **MR. YAGER: May we approach?**
> **(Thereupon, a discussion was held at the bench between Court and counsel.)**
> **THE COURT: The objection is overruled. You may answer if you wish.**
> **A: Based upon my experience, people that's that hysterical, they're telling the truth.**

(Id. at 299). Taylor argues that the trial court erred by allowing Lieutenant Shenefield's answer on redirect. However, it is clear that Taylor opened the door to this testimony through cross-examination, and therefore, any error by the trial court would be invited error upon which Taylor may not seek relief. *State v. Labrun* (Mar. 26, 1999), 3d Dist. No. 10-98-19, at *3, citing *State v. Chappell* (1994), 97 Ohio App.3d 515, 537, 646 N.E.2d 1191, *State v. Greer* (1988), 39 Ohio St.3d 236, 243, 530 N.E.2d 382, and *State v. Hartford* (1984), 21 Ohio App.3d 29, 31, 486 N.E.2d 726. Accordingly, this argument is meritless.

{¶71} In his fourth, fifth, sixth, and seventh assignments of error, Taylor argues that the trial court erred by not allowing several witnesses to testify concerning Elizabeth Shipman's character for untruthfulness.

{¶72} Evid.R. 403(A)(3) provides, "[e]vidence of the character of a witness on the issue of credibility is admissible as provided in rules 607, 608, and 609." Evid.R. 608(A) provides, in pertinent part: "[t]he credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation, but subject to these limitations: (1) the evidence may refer only to character for truthfulness or untruthfulness * * *."

{¶73} Before a witness may impeach another witness by testifying that the witness has a reputation for being untruthful, however, the proponent of the impeaching witness must lay a proper foundation by establishing that the

impeaching witness is in a position to know the reputation of the witness to be impeached. *State v. Solomon*, 9th Dist. No. 23545, 2008-Ohio-553, ¶15. See, also, *State v. Agner* (1972), 30 Ohio App.2d 96, 283 N.E.2d 443. "The impeaching witness must live in, do business in, or have some other relationship with the community in which the witness to be impeached lives." *Solomon*, 2008-Ohio-553, at ¶15, citing *Radke v. State* (1923), 107 Ohio St. 399, 140 N.E. 586, paragraph one of the syllabus. "The critical issue is not whether the impeaching witness knows the person to be impeached, but rather whether the impeaching witness has had sufficient contacts with the community to know the reputation for truthfulness of the person to be impeached." Id., citing *City of Columbus v. Puckett* (Aug. 1, 1989), 10th Dist. Nos. 89AP-75, 89AP-76, at *2.

{¶74} Jennifer Shipman testified that Elizabeth was her older sister, who she lived with until she turned eighteen (Tr. at 1173-74). Jennifer testified that she: has lived in Marion her whole life; has attended school in Marion; has worked in Marion; knew many people in Marion; and knew Elizabeth's reputation in the community. (Id. at 1174-77).

{¶75} Jonathon Taylor, Sr. testified that: he lived in Marion his entire life; graduated from high school in Marion; Elizabeth was his niece; that he's had contact with Elizabeth "[i]ntermittently. Every once in a while"; he would go over

to Elizabeth's house and she would come over to his house; and that he was familiar with Elizabeth's reputation for truthfulness and veracity. (Id. at 1180-84).

{¶76} Jonathon Taylor, Jr. testified that: he lived in Marion pretty much his whole life; attended school in Marion; Elizabeth was his first cousin; he would go to her house "often"; and that he was familiar with Elizabeth's reputation for truthfulness. (Id. at 1186-90).

{¶77} Adreena Shipman testified that her daughter, Elizabeth, was 24 years old, and that she has lived with her for at least 23 of those 24 years. (Tr. at 838). Adreena testified that she has resided in Marion County for most of her life, and that she knows the Marion community. (Id. at 839). Thereafter, the following dialogue occurred:

> **Q: Do you have knowledge as to your daughter's reputation for being truthful and honest?**
> **A: She has a tendency to stretch the truth.**
> **MR. YAGER: Objection.**
> **Q: The question is do you have knowledge as to her reputation, that's the first question.**
> **A: Yes.**
> **Q: And what is that reputation?**
> **A: She tends to stretch the truth. She can exaggerate.**
> **MR. YAGER: Objection, Your Honor.**
> **THE COURT: Sustained.**
> **Q: And do you yourself know her to be a truthful person?**
> **A: Not very.**
> **Q: And what's "not very" mean to you?**
> **A: She's not very truthful.**
> **Q: She came in here and took an oath and swore to tell the truth, would you believe her?**
> **A: No.**

**MR. YAGER: Objection.**
**THE COURT: Sustained.**
**MR. RATLIFF: May we approach the bench, Your Honor?**
**THE COURT: Yes.**
**\* \* \***
**Q: And is her reputation good or bad?**
**MR. YAGER: Objection, that's repetitive. He's asked her.**
**THE COURT: I'll allow it.**
**A: Bad.**

(Tr. at 839-41).

{¶78} The trial court did not abuse its discretion by sustaining the State's objections to the testimony of Jennifer Shipman, Jonathon Taylor, Sr., or Jonathon Taylor, Jr. concerning Elizabeth's reputation for untruthfulness. Although each of these witnesses testified that they knew Elizabeth, their testimony did not demonstrate that they had "sufficient contacts with the community to know the reputation for truthfulness of the person to be impeached." *Solomon*, 2008-Ohio-553, at ¶15, citing *Puckett*, 10th Dist. Nos. 89AP-75, 89AP-76, at \*2. Namely, the witnesses never testified that they were associated with or knew persons in the community that also knew Elizabeth, and that they discussed Elizabeth's untruthfulness with those individuals. Furthermore, Jonathon Taylor, Sr. testified that he only had contact with Elizabeth "[i]ntermittently. Every once in awhile," and Jonathon Taylor, Jr. testified that he did not attend schools at the same time as Elizabeth since he was older than she. (Tr. at 1182, 1189). This testimony raises

doubts concerning how well these witnesses even knew Elizabeth, let alone her reputation in the community.

{¶79} The trial court also did not abuse its discretion by sustaining the State's objections on Adreena's testimony. As an initial matter, we note that it is impossible to determine the exact reason(s) that the trial court excluded portions of Adreena's testimony, because the prosecution did not state its ground(s) for objecting several times. That being said, Adreena's testimony lacks a sufficient foundation for testimony concerning Elizabeth's reputation for untruthfulness for the same reasons mentioned above with regard to the defense's other three witnesses. Aside from that, the trial court could have sustained the State's objections under Evid.R. 403(B), because Adreena's answers were cumulative and repetitive in light of the fact that Adreena already had testified that Elizabeth: "has a tendency to stretch the truth"; was "not very truthful"; and had a "bad" reputation.

{¶80} *Even if* we were to assume that the trial court's evidentiary rulings were erroneous, "an appellate court will not reverse judgments for an erroneous evidentiary ruling unless it appears that the defendant's rights have been prejudiced." *State v. Messenger*, 3d Dist. No. 9-09-19, 2010-Ohio-479, ¶46, citing *State v. Schofield*, 4th Dist. Nos. 01CA36, 02CA13, 2002-Ohio-6945, ¶138. See, also, Evid. R. 103(A); Crim.R. 52(A). The trial court here allowed Adreena and

Taylor to testify concerning Elizabeth's untruthfulness and allowed Taylor to testify concerning Elizabeth's motive to lie about him. (Tr. at 839-41, 1257-59, 1265, 1315). Aside from that, we do not believe that allowing this testimony would have changed the outcome of the proceedings in light of the substantial evidence presented demonstrating Taylor's guilt. Therefore, the trial court's rulings excluding evidence of Elizabeth's reputation for untruthfulness, even if erroneous, did not prejudice Taylor.

{¶81} For all these reasons, Taylor's third, fourth, fifth, sixth, and seventh assignments of error are overruled.

### ASSIGNMENT OF ERROR NO. VIII

**DEFENDANT-APPELLANT RECEIVED PREJUDICIALLY INEFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF HIS SIXTH AND FOURTEENTH AMENDMENT RIGHTS AND HIS RIGHTS UNDER SECTION 10, ARTICLE I, OHIO CONSTITUTION.**

{¶82} In his eighth assignment of error, Taylor argues that his trial counsel was ineffective for failing to lay a proper foundation for the testimony concerning Elizabeth's reputation for untruthfulness. We disagree.

{¶83} A defendant asserting a claim of ineffective assistance of counsel must establish: (1) the counsel's performance was deficient or unreasonable under the circumstances; and (2) the deficient performance prejudiced the defendant. *State v. Kole* (2001), 92 Ohio St.3d 303, 306, 750 N.E.2d 148, citing *Strickland v.*

*Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674. Prejudice results when "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *State v. Bradley* (1989), 42 Ohio St.3d 136, 142, 538 N.E.2d 373, citing *Strickland*, 466 U.S. at 691. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Bradley*, 42 Ohio St.3d at 142; *Strickland*, 466 U.S. at 694.

{¶84} Although trial counsel failed to lay a proper foundation for the reputation testimony, we cannot conclude that Taylor was prejudiced by trial counsel's error. As we have previously mentioned, the trial court allowed both Taylor and Adreena to testify about Elizabeth's untruthfulness, and furthermore, allowed Taylor to testify concerning Elizabeth's motive to lie about him. (Tr. at 839-41, 1257-59, 1265, 1315). Additionally, we cannot conclude that "but for counsel's unprofessional errors, the result of the proceeding would have been different" in light of the substantial evidence of Taylor's guilt; and therefore, Taylor has failed to demonstrate prejudice sufficient to sustain his ineffective assistance of counsel claim.

{¶85} Taylor's eighth assignment of error is, therefore, overruled.

**ASSIGNMENT OF ERROR NO. IX**

**THE COMBINATION OF THE AFOREMENTIONED ERRORS ARE SUFFICIENT TO CALL INTO QUESTION THE VALIDITY OF THE VERDICT, PREVENTING THE APPELLANT FROM OBTAINING THE FAIR TRIAL GUARANTEED BY THE FIFTH AND SIXTH AMENDMENTS TO THE U.S. CONSTITUTION AS MADE APPLICABLE TO THE STATES BY THE FOURTEENTH AMENDMENT, AND ARTICLE ONE SECTIONS TEN AND SIXTEEN OF THE OHIO CONSTITUTION.**

{¶86} In his ninth assignment of error, Taylor argues that the combination of the aforementioned errors denied him his constitutional right to a fair trial and creates a reasonable probability that, without these errors, the results of the proceedings would have been different.

{¶87} Taylor's argument lacks merit. It is well established that "'[t]he failure to establish multiple instances of harmless error makes the doctrine of cumulative error inapplicable.'" *Messenger*, 2010-Ohio-479, at ¶64, quoting *State v. Hupp*, 3d Dist. No. 1-08-21, 2009-Ohio-1912, ¶33, citing *State v. Hohvart*, 7th Dist. No. 06 MA 43, 2007-Ohio-5349, ¶37. Since Taylor has failed to demonstrate error herein, Taylor has also failed to demonstrate cumulative error.

{¶88} Taylor's ninth assignment of error is, therefore, overruled.

**ASSIGNMENT OF ERROR NO. X**

**THE TRIAL COURT ERRED TO THE PREJUDICE OF DEFENDANT-APPELLANT BY IMPOSING MAXIMUM AND CONSECUTIVE SENTENCES WITHOUT MAKING ANY FINDINGS REQUIRED BY R.C. 2929.14(E)(4).**

{¶89} In his tenth assignment of error, Taylor argues that the trial court erred by imposing maximum and consecutive sentences without making R.C. 2929.14(E)(4) findings. Specifically, Taylor submits that R.C. 2929.14(E)(4) findings are now required because *Oregon v. Ice* (2009), 555 U.S. 160, 129 S.Ct. 711, 172 L.Ed.2d 517 abrogated *State v. Foster*, 109 Ohio St.3d 1, 2006-Ohio-856, 845 N.E.2d 470.

{¶90} Taylor's argument lacks merit. The Ohio Supreme Court has recently held that: "* * * *Oregon v. Ice* does not revive Ohio's former consecutive-sentencing statutory provisions, R.C. 2929.14(E)(4) and 2929.41(A), which were held unconstitutional in *State v. Foster*." *State v. Hodge*, 128 Ohio St.3d 1, 2010-Ohio-6320, 941 N.E.2d 768, ¶39. "[T]rial court judges are not obligated to engage in judicial fact-finding prior to imposing consecutive sentences unless the General Assembly enacts new legislation requiring that findings be made." Id.

{¶91} Taylor's tenth assignment of error is, therefore, overruled.

{¶92} Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

***Judgment Affirmed***

**SHAW and WILLAMOWSKI, J.J., concur.**

**/jlr**